**Robert J. RIETHER and Judy Riether, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Nos. 10–cv–0622–BRB–LAM, 11–cv–0664–BRB–LAM.**

United States District Court, D. New Mexico.

June 21, 2012.

Thomas Smidt, III, Thomas Smidt, II, Tax, Estate & Business Law, Ltd., Albuquerque, NM, Matthew Yackshaw, Day Ketterer Ltd., Canton, OH, for Plaintiffs.

Cynthia E. Messersmith, U.S. DOJ, Tax Division, Dallas, TX, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BOBBY R. BALDOCK, Circuit Judge.

Plaintiffs Robert and Judy Riether filed these consolidated tax refund actions, seeking a refund of approximately $112,440 in taxes, interest paid, and penalty assessments for the taxable years 2003, 2004, and 2006. The larger portion of the dispute in this case involves certain non-cash charitable donations Plaintiffs made during 2001, 2003, and 2004. Plaintiffs assert the IRS incorrectly denied Plaintiffs tax deductions for these charitable contributions. As an alternative theory of recovery, Plaintiffs seek a theft loss deduction with respect to some of the property on the theory that the donee fraudulently represented it was a qualified charitable organization under Internal Revenue Code (I.R.C.) § 170(c). The amount of loss under this alternative theory is approximately $165,000. In addition, Plaintiffs challenge the Government's determinations that Plaintiffs failed to report $10,878 in self-employment tax on their 2006 return, that Plaintiffs underreported retirement distributions by $38,100, and that Plaintiffs inappropriately took a $5,980 withholding tax credit on their 2006 return. Finally, Plaintiffs challenge the Government's imposition of a substantial understatement penalty in the amount of $7,599.60 based on Plaintiffs' 2006 return. The Government filed a motion for summary judgment or, alternatively, partial summary judgment, which is now before the Court.

### I.

#### A.

The undisputed facts are as follows.[1] Plaintiff Robert Riether is a doctor of osteopathy and radiology. He and his wife, Plaintiff Judy Riether, were at one time the sole shareholders in several subchapter S corporations that provided x-ray services in the State of Ohio. These corporations were Medi Trans X–Ray Services, Orrville Diagnostic Imaging, Trans–Ohio Radiologists, and X–Ray Physicians. Plaintiffs also jointly owned New Mexico Medical Diagnostic Imaging, LLC, during the year 2006. In 2001, Plaintiffs donated a substantial amount of medical equipment from their Ohio businesses to Whitecross Medical Missions Corporation, a corporation organized under the laws of Kentucky. A genuine dispute exists as to whether Whitecross's president informed Plaintiffs

---

1. In their response to the Government's motion, Plaintiffs say they "completely reject and object to the entire Statement of Undisputed Facts provided by Defendant United States of America because it is inaccurate, misleading, and irrelevant." But Plaintiffs do not identify *any* particular facts they consider inaccurate or misleading. Instead, they simply give their own statement of facts. In doing so, Plaintiffs have failed to comply with Local Rule 56.1(b), which requires "a concise statement of material facts cited by the movant as to which the non-movant contends a genuine issue does exist." Plaintiffs' use of hyperbole is itself inaccurate and misleading, because Plaintiffs appear to agree with Government regarding the vast majority of material facts. Most of the facts in this case relate to Plaintiffs' various tax returns, which are attached to both parties' briefs and are not susceptible to varying interpretations.

that Whitecross was a charitable organization authorized to accept tax deductible donations.[2]

A certified public accountant, Stephen Miller, prepared Plaintiffs' tax returns for each year at issue in this case. On their 2001 tax return, Plaintiffs listed non-cash charitable contributions totaling $639,195, in addition to $33,415 in cash contributions. (Dkt. No. 49–5 at 2.) Due to income limitations, they only claimed a charitable deduction of $338,052. (*Id.*) Plaintiffs attached to their return IRS Form 8283 for "Noncash Charitable Contributions." Section A of this form applies to contributions of $5,000 or less, whereas Section B, the "Appraisal Summary," is for contributions "of more than $5,000 per item or group." Plaintiffs completed part of Section B, and listed their "cost or adjusted basis" in the equipment at $1,212,000. (Dkt. No. 49–6 at 1.) Part III of the Appraisal Summary requires the declaration of an appraiser stating the following: (1) he is not the donor, donee, or a party to the transaction, (2) he holds himself out to the public as an appraiser and performs appraisals on a regular basis, (3) he is qualified to make appraisals of the property being valued, and (4) the appraisal fees were not based on a percentage of the appraised property value. (*Id.* at 1.) No appraiser executed

this section, and Plaintiffs appraised the equipment themselves. According to Plaintiffs, "All of the values assigned to the various pieces of donated x-ray equipment and supplies were determined by researching the marketplace for used medical equipment and supplies." Plaintiffs also assert they "conservatively valued" the equipment at "less than one-half of . . . the original cost." Plaintiffs also left blank Part IV of the Appraisal Summary, the "Donee Acknowledgement." It requires the charitable organization to acknowledge it is a qualified charitable organization under I.R.C. § 170(c). (Dkt. No. 49–6 at 1.) Plaintiffs did, however, attach to their tax return a document on Whitecross letterhead labeled "RECEIPT" that acknowledged receipt of the equipment "detailed in Exhibit A attached hereto." (Dkt. No. 49–6, at 3.) Exhibit A was an accurate list of the donated property.

Because Plaintiffs' income only allowed them to claim part of these contributions as deductions in 2001, they carried over $334,558 in charitable contributions to their 2002 income tax return. Plaintiffs claimed a charitable deduction of $90,252 on their 2002 returns, based on $26,905 in cash contributions during 2002 and part of the carryover from 2001. (Dkt. No. 49–8 at 2.) The IRS did not audit Plaintiffs' 2002

**2.** Whitecross's president, James Bowman, stated in his deposition that he never told Plaintiffs the donations would be tax deductible, though he did describe Whitecross as a "nonprofit." (Dkt. No. 49–4 at 9.) In her deposition, Judy Riether said Bowman provided Plaintiffs with "his 501(c)(3) [documents] showing that [Whitecross] was a charity," but she could not remember him "verbally" representing that contributions to Whitecross would be deductible. (*Id.* at 6.) In her affidavit attached to Plaintiffs' response brief, however, Judy Riether alleges that "Whitecross itself directly informed us that it was . . . authorized to accept tax deductible donations of medical equipment and supplies. . . ." (Dkt. No. 56–9 at 4.) The con-

tradictions between Mrs. Riether's deposition and her affidavit may very well be "an attempt to create a sham fact issue." *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir.2003) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)). But the Court need not decide whether to disregard Mrs. Riether's affidavit as creating a sham issue. Robert Riether averred in his affidavit that Bowman informed him via telephone that "any donation made to Whitecross would be deductible." (Dkt. No. 56–1 at 6.) This statement does not conflict with any of Dr. Riether's prior sworn testimony, so it suffices to raise a disputed issue of fact.

return, which is only relevant because of the charitable contribution amounts Plaintiffs carried over.

In 2003, Plaintiffs made another contribution of used medical equipment to Whitecross, equipment they valued at $365,610. On their 2003 tax return, Plaintiffs listed charitable cash donations of $8,965 and noncash contributions of $365,610, as well as a carryover of $271,211 from 2002. (Dkt. No. 49–9 at 2.) This time, Plaintiffs listed the contributions under Section A of IRS Form 8283, for items on which the taxpayer "claimed a deduction of $5,000 or less." (*Id.* at 3.) Plaintiffs listed their cost or adjusted basis as $730,000 and the resale value of the equipment as $365,610. (*Id.*) They did not attach Section B, the Appraisal Summary, to the return, nor did the return contain any other statements by an independent appraiser. They did attach a document listing the donated items and their values, as well as a signed letter by Whitecross's president acknowledging receipt of the equipment. (Dkt. No. 49–9, at 5.) Because of income limitations, Plaintiffs only claimed a charitable deduction of $87,005 on their 2003 return, and carried over the remainder.

In 2004, Plaintiffs made a third charitable contribution. This time, they donated two 2001 Chevrolet G3500 vans, one to Cornerstone Chapel and one to Frontline Ministries. The Government does not dispute Cornerstone and Frontline were qualified to receive charitable contributions under I.R.C. § 170(c). On their 2004 tax return, Plaintiffs listed a cash donation of $2,100, a noncash charitable contribution of $29,000 for the two vans, and a carryover of $558,781. (Dkt. No. 49–10 at 2.) They attached a Form 8283, listing the cost basis of each van as $45,000 and the fair market value of each as $14,500. (Dkt. No. 49–11 at 1.) This time, Plaintiffs ensured Form 8283 was completed. They

attached a letter from James McLaughlin at Skipco Financial Adjusters/Skipco Auto Auction stating each van had a retail value of $14,500 and a wholesale value of $10,200. (Dkt. No. 49–12, at 2.) Mr. McLaughlin completed a "Declaration of Appraiser" for each van. (Dkt. Nos. 49–11 at 3; 49–12 at 1.) Cornerstone and Frontline also completed the "Donee Acknowledgement" for their respective donations. (*Id.*) Plaintiffs attached letters from both Frontline and Cornerstone which said they gave no goods or services in exchange for the donations. (Dkt. Nos. 49–11 at 2; 49–12 at 3.) Plaintiffs claimed a charitable deduction in the amount of $148,916 for 2004. (Dkt. No. 49–10 at 2.)

Plaintiffs' 2005 tax return, which the IRS did not audit and which is not directly at issue in this case, listed $2,075 in charitable cash contributions, and a carryover of $440,965 from the prior year. (Dkt. No. 50 at 2.) Plaintiffs took a charitable deduction of $51,457 in 2005.(*Id.*) Plaintiffs' 2006 tax return listed cash donations of $1,595 and a carryover of $391,583 from 2005. (Dkt. No. 50–1 at 2.) Plaintiffs claimed a total charitable deduction in 2006 of $57,852. (*Id.*)

## B.

All was well until Plaintiffs experienced a taxpayer's worst nightmare-an IRS audit. The IRS limited its audit to Plaintiffs' 2003, 2004, and 2006 returns. The IRS disallowed charitable deductions of $78,040 for 2003; $125,816 for 2004, and $56,257 for 2006. The IRS denied these deductions on the basis that the contributions were not made to a charitable organization as defined by § 170(c).

The IRS also determined Plaintiffs owed self-employment tax on their share of the ordinary income from New Mexico Diagnostic Imaging, LLC in 2006. The LLC's treatment of its 2006 income is somewhat

confusing. First, the LLC issued Forms W–2 showing salaries or wages of $25,750 to each Plaintiff, for a total of $51,500. Plaintiffs reported $51,500 in wages on line 7 of their 2006 tax return. (Dkt. No. 50–1 at 1.) The LLC withheld federal income and FICA (self-employment) taxes from these wages, and the IRS found no fault with Plaintiff's treatment of these wages. Second, the LLC issued Plaintiffs Schedules K–1 with their distributive share of the remainder of the LLC's income. (2006 Form 1065, Dkt. No. 53–2 at 2–3.) Each Schedule K–1 showed $38,493 in income to each Plaintiff, for a total of $76,986. (*Id.*) Plaintiffs reported this amount on line 17 of their 2006 Form 1040, but did not pay any self-employment tax on this income, treating it instead as if it were investment or other passive income. The IRS determined Plaintiffs were subject to $10,878 in unpaid self-employment taxes on their $76,986 distributive share of the LLC's earnings. At the same time, the IRS allowed Plaintiffs an above-the-line deduction of $5,438 on their 2006 return, representing one-half of the self-employment tax liability.[3] The parties do not explain why the IRS allowed this deduction.

The IRS made three additional assessments, two of which are not at issue in this motion, but nevertheless add to the confusion. First, the IRS disallowed a $5,980 withholding tax credit for retirement distributions made in 2006. Second, the IRS determined Plaintiffs had failed to report $38,100 of income resulting from retirement distributions. The Government now concedes these two actions were erroneous, meaning the Government recognizes Plaintiffs are entitled to at least a partial refund.[4] The Government says, "[O]nce the other matters in this case are resolved, the United States will ask the IRS to determine the overpayment that will result from conceding those adjustments." Finally, the IRS imposed a substantial understatement penalty of $7,599. The Government argues this penalty was valid, but it says the amount should be reduced in light of the two errors it concedes.

## C.

Before the audit was complete, Plaintiffs filed a refund action, number 10–CV–622. After the audit, they paid the tax deficiencies, interest, and penalty assessed by the IRS, and filed amended returns for 2003, 2004, and 2006. When the IRS did not accede to their administrative request for a refund, they filed a second lawsuit, number 11–CV–0664. This Court consolidated the cases, and Plaintiffs filed an Amended Complaint setting forth the following claims: (1) a refund of 2003 federal income taxes, (2) a refund of 2004 federal income taxes, (3) a refund of 2006 federal income taxes, and (4) a refund of income taxes for 2003, 2004, and 2006 on an alternative theft loss theory.

The Government moved for summary judgment or, alternatively, partial summary judgment, raising a number of arguments. With respect to the 2001 and 2003 donations of medical equipment to Whitecross, the Government makes three alternative arguments. First, it argues Plaintiffs have failed to establish their adjusted basis in the medical equipment. Second, it ar-

---

3. An above-the-line deduction is a deduction that taxpayers can "subtract from gross income ... to arrive at 'adjusted gross income.'" *Scott v. United States,* 328 F.3d 132, 137 (4th Cir.2003). The taxpayers then calculate their taxable income by "subtracting from adjusted gross income the 'itemized' (or "below-the-line") deductions." *Id.*

4. Because of this concession, the Court treats the Government's motion as a motion for partial summary judgment. *See* Fed.R.Civ.P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the *part of each claim or defense*—on which summary judgment is sought.") (emphasis added).

gues Plaintiffs failed to substantiate the donations as required by I.R.C. § 170 and its associated Treasury regulations. Third, it argues Whitecross is not a charitable organization under the meaning of I.R.C. § 170(c).[5] In response to Plaintiffs' alternative theory of theft loss, the Government argues Plaintiffs cannot recover for two reasons. First, Plaintiffs have failed to establish their adjusted basis in the equipment. Second, no evidence supports the claim that Whitecross made misrepresentations or intended to deceive Plaintiffs. As to the Chevrolet vans donated to Cornerstone Chapel and Frontline Ministries, the Government asserts Plaintiffs failed to establish their basis in the vans and failed to obtain qualified appraisals. Finally, with respect to Plaintiffs' self-employment tax in 2006, the Government argues Plaintiffs are subject to the tax on their distributive share of income from New Mexico Diagnostic Imaging, LLC, because the LLC did not elect to be taxed as a corporation. Finally, the Government argues Plaintiffs are liable for a substantial underpayment penalty under I.R.C. § 6662(d) because they substantially understated their income. In the alternative, the Government argues the penalty is justified as a negligence penalty under § 6662(c).

## II.

With these facts and arguments in mind, the Court turns to the applicable law. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). To the extent material facts are genuinely disputed, the Court views the facts in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment bears the initial burden of indicating the portions of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." *Libertarian Party of NM v. Herrera,* 506 F.3d 1303, 1309 (10th Cir.2007) (quoting Fed. R.Civ.P. 56(e) (2007 version)).

### A.

■■■ The Court must resolve two initial disputes. First, the parties dispute who has the ultimate burden of proof. Generally, the taxpayer bears the burden of proof in a refund suit. *Dye v. United States,* 121 F.3d 1399, 1408 (10th Cir.1997). But if the "taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the burden of proof shifts to the Government *with respect to that fact issue.*[6] I.R.C. § 7491(a)(1). Credible evi-

---

5. The careful reader will observe that Plaintiffs claimed over $475,000 in deductions during 2001, 2002, and 2005 that were impermissible according to the Government's theory, yet were not subject to an audit. The statute of limitations now appears to protect Plaintiffs from any assessment on underpayments resulting from these tax years. *See* I.R.C. § 6501(a).

6. The Supreme Court has explained that the term "burden of proof" encompasses "two distinct burdens: the 'burden of persuasion,' *i.e.,* which party loses if the evidence is closely balanced, and the 'burden of production,' *i.e.,* which party bears the obligation to come forward with the evidence at different points in the proceeding." *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). Section 7481(a)(1) refers to the "burden of proof" generally, so this Court treats it as encompassing both the burden of persuasion and of production.

dence means "the quality of evidence, which after critical analysis, the court would find sufficient upon which to base a decision ... if no contrary evidence were submitted." *Rendall v. Comm'r*, 535 F.3d 1221, 1225 (10th Cir.2008) (quoting *Blodgett v. Comm'r*, 394 F.3d 1030, 1035 (8th Cir.2005)). Section 7491's burden-shifting is further limited by the requirement that the taxpayer "has complied with the requirements under this title to substantiate any item" and "has maintained all records required under this title." I.R.C. § 7491(a)(2)(A), (B). As will become clear, Plaintiffs failed to submit credible evidence or comply with the Revenue Code's substantiation requirements with respect to all their noncash charitable contributions, so they bear the burden of proof on the factual issues relating to those contributions. With respect to their self-employment tax liability, Plaintiffs have not attempted to put any facts in dispute, so the burden of proof is irrelevant. The only questions involved on that issue are legal questions. Finally, § 7491(a)'s burden-shifting scheme does not apply to the validity of the substantial underpayment penalty. Instead, § 7491(c) indicates that the Government "shall have the burden of production" on this issue.

## B.

■ As a second order of preliminary business, the Court must address Plaintiffs' assertion that most of the Government's arguments are barred because the IRS did not raise them during the administrative process. The only reason the IRS gave for denying deductions for the Whitecross contributions is that Whitecross was not a charitable organization. Only in response to this refund action did the Government raise Plaintiffs' failure to substantiate the donations and to demonstrate a basis in the donated property. Plaintiffs cite three authorities in support of their argument that "[t]he Government

is not permitted to raise an issue in litigation where there was no[ ] mention of that issue in the notice of deficiency."

Plaintiffs first cite *Lewis v. Comm'r*, 57 T.C.M. (CCH) 684 (1989), which was not a refund action. In *Lewis*, the taxpayers and the Government reached a settlement and signed a stipulation of the taxpayers' liability that they filed with the tax court. *Id.* The stipulation said nothing about self-employment taxes, and the Government had not included self-employment taxes in the notice of deficiency. *Id.* The Government then prepared a proposed stipulated decision, which included $1,544 in self-employment taxes the taxpayers allegedly owed. *Id.* The tax court noted that *neither* the notice of deficiency *nor* the stipulation filed with the court had mentioned these taxes. *Id.* The court concluded the settlement could not include self-employment taxes because the Government had not given the taxpayers notice of the claim when the parties entered into the settlement. *Id. Lewis* differs from this case because it involved the Government asserting additional deficiencies after entering a settlement agreement. Nothing similar took place here.

Plaintiffs next cite *United States v. Nipper*, 3 Fed.Appx. 882 (10th Cir.2001) (unpublished), asserting the Tenth Circuit in *Nipper* "would not permit the government to raise an issue in tax litigation that was not set forth in the notice of deficiency." Plaintiffs have mischaracterized *Nipper* completely. In *Nipper*, the Government asserted the taxpayers should have reported self-employment income from a trash collection service. *Id.* at 884. But the "totality of the evidence" supporting the tax assessment was unsupported statements in attachment to the notice of deficiency. *Id.* The Tenth Circuit concluded the Government had not provided "the required minimal evidentiary foundation" to

shift the burden to the taxpayer because the "statements in the Notice of Deficiency do not link [the taxpayer] with an income-producing activity or ownership of an asset which produced income." *Id.* at 884, 885. *Nipper* said nothing about the Government being limited to the issues set forth in the notice of deficiency. So *Nipper* is inapposite.

Finally, Plaintiffs cite the Supreme Court's decision in *Helvering v. Tex–Penn Oil Co.,* 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1937). There, the Government raised a theory for the first time before the Supreme Court. *Id.* at 497, 57 S.Ct. 569. The Court said, "The Commissioner's notices of deficiency do not suggest the construction for which he now contends. He sought no ruling upon the question from the Board [of Tax Appeals] or the lower court and is therefore not entitled to have it decided here." *Id.* at 498, 57 S.Ct. 569. Although the Court mentioned the Government's failure to raise the theory in the notice of deficiency, it focused on the Government's failure to raise it in the lower courts. It cited *Helvering v. Minnesota Tea Co.,* 296 U.S. 378, 380, 56 S.Ct. 269, 80 L.Ed. 284 (1935), which refused to consider a point "not raised prior to the petition for certiorari." So *Tex–Penn Oil* hardly supports Plaintiffs' argument.

The Tenth Circuit has indicated the Government cannot raise a new issue in a tax enforcement action where its failure to give notice prejudices the taxpayer. *See Klaas v. Comm'r,* 624 F.3d 1271, 1274 (10th Cir.2010) (citing *Pagel, Inc. v. Comm'r,* 91 T.C. 200, 211–12, 1988 WL 81469 (1988)). But a refund action is a horse of a different color. Tax refund cases in district courts are "*de novo* proceedings." *Hyatt v. Kappos,* 625 F.3d 1320, 1340 (Fed.Cir.2010), *aff'd* —— U.S. ——, 132 S.Ct. 1690, 182 L.Ed.2d 704 (2012) (quoting *Democratic Leadership Council,*

*Inc. v. United States,* 542 F.Supp.2d 63, 70 (D.D.C.2008)). As the Supreme Court has explained,

> [T]he ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. *This involves a redetermination of the entire tax liability.* While no new assessment can be made, after the bar of the statute [of limitations] has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax.

*Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293, *modified* 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932) (emphasis added) (quoting *Lewis v. Reynolds,* 48 F.2d 515, 516 (10th Cir.1931)).

■ Relying on the Supreme Court's decision in *Lewis,* the Tenth Circuit allowed the Government to change its theory when defending against a refund action. In *Dye,* the taxpayer reported certain lawsuit settlement proceeds as long-term capital income. *Dye,* 121 F.3d at 1407. The IRS did not challenge this characterization of the income, but notified the taxpayer of a deficiency based on her failure to calculate her alternative minimum tax under I.R.C. § 56. *Id.* at 1403. The IRS also said the attorney's fees the taxpayer paid in the lawsuit could not count as capital expenditures. *Id.* In response to her refund suit, however, the Government argued the settlement proceeds should have been treated as ordinary income, rather than capital income. *Id.* at 1407. Relying on *Lewis,* the Tenth Circuit concluded the Government could change its theory. *Id.* at 1408. To receive a refund, the court said, the taxpayer must prove the amount she paid "exceeds the amount which *might* have been properly assessed and demanded." *Id.* at 1407–08 (brackets omitted) (quoting *Lewis,* 284 U.S. at 283, 52 S.Ct. 145 and adding emphasis). That is, "if any

of [the taxpayer's] settlement proceeds *should* have been characterized as ordinary rather than capital income," the IRS could offset the properly calculated amount against the refund. *Id.* at 1408. *Lewis* and *Dye* make it amply clear that *in a refund suit* the Government is not limited to the grounds raised in its notice of deficiency or the earlier IRS proceedings. Accordingly, the Court will consider all of the Government's arguments in addressing whether Plaintiffs were entitled to the disputed deductions.

### III.

The first deductions at issue are those based on the donation of medical equipment to Whitecross in 2001 and 2003. Because Plaintiffs carried parts of these contributions over into later years, these donations affected their returns in all three years at issue: 2003, 2004, and 2006. The Government makes three arguments why these deductions were impermissible. For reasons that will soon become clear, the Government is entitled to summary judgment based on any one of these three arguments, but the Court will address all three for the sake of thoroughness. The Court will turn to the Government's second argument first, because it allows the Court to more quickly determine which party has the burden of proof under § 7491.

### A.

The Government's second alternative argument is that Plaintiffs failed to adequately document their deductions to Whitecross on their 2001 and 2003 tax returns. Two distinct forms of documentation are at issue. First, the Government argues Plaintiffs have failed to provide an adequate donee acknowledgment. Second, the Government argues Plaintiffs have failed to obtain a qualified appraisal. The Court will address each requirement in turn.

### 1.

The Revenue Code says "no deduction shall be allowed ... for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)." I.R.C. § 170(f)(8)(A). Subparagraph (B), in turn, requires the acknowledgment to include (1) a description of any non-cash contribution, (2) whether the donee organization provided any goods or services as consideration for the property, and (3) a description and good faith estimate of the value of any such consideration, "or if such goods or services consist solely of intangible religious benefits, a statement to that effect." *Id.* § 170(f)(8)(B). An acknowledgment is "contemporaneous" if it is received before the filing deadline for the taxable year in which the contribution was made. *Id.* § 170(f)(8)(C). Plaintiffs have not introduced any acknowledgments from either 2001 or 2003 that meet the requirements of § 170(f)(8). The 2001 receipt on Whitecross letterhead provided a description of the donated goods, as required by § 170(f)(8)(B)(i). But it did not state whether Whitecross had provided any goods or services as consideration for the goods. Similarly, the 2003 letter acknowledging receipt of the second donation did nothing more than list the donated equipment. So Plaintiffs have failed to "substantiate[ ]" the contribution by a contemporaneous written acknowledgement" as required by I.R.C. § 170(f)(8).

Plaintiffs nevertheless argue they substantially complied with the contemporaneous acknowledgement requirement. The Tenth Circuit has never recognized the common law doctrine of substantial compliance in tax cases, although it has considered a statutory version of the doctrine.

*See Estate of Doherty v. Comm'r,* 982 F.2d 450, 454–55 (10th Cir.1992) (considering the substantial compliance requirement of the version of I.R.C. § 2032(A)(d)(3)(B) then in effect). The Tax Court, on the other hand, has recognized the common law doctrine of substantial compliance for over thirty years. *See Taylor v. Comm'r,* 67 T.C. 1071, 1077–78 (1977). Under the Tax Court's formulation, "the critical question is whether the [statutory] requirements relate 'to the substance or essence of the statute.' " *Friedman v. Comm'r,* 99 T.C.M. (CCH) 1175 at *3 (2010) (quoting *Bond v. Comm'r,* 100 T.C. 32, 40–41 (1993)). Some circuits have "criticized the Tax Court's articulation of the doctrine for formlessness." *Tamulis v. Comm'r,* 509 F.3d 343, 345 (7th Cir.2007). *See Prussner v. United States,* 896 F.2d 218, 224 (7th Cir.1990) (en banc) (rejecting the Tax Court's formulation of the doctrine and adopting a narrower version); *McAlpine v. Comm'r,* 968 F.2d 459 (5th Cir.1992) (citing *Prussner* approvingly). The doctrine as applied by the Seventh Circuit extends only to situations "in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute." *Prussner,* 896 F.2d at 224.

■ The Court need not decide which formulation of the doctrine is appropriate, because Plaintiffs' argument fails under even the Tax Court's more lenient version. The substantiation requirements of § 170(f)(8) are unambiguous. The statutes says, "No deduction shall be allowed" unless it "meets the requirements of subparagraph (B)." I.R.C. § 170(f)(8)(A). The requirements of subparagraph (B) would thus seem to go to the "substance or essence of the statute." *Friedman,* 99 T.C.M. (CCH) 1175 at *3. The Tax Court faced a similar case in *Friedman.* There, the taxpayers attached donee receipts for some, but not all, of the items they donated. *Id.* The receipts they included did not contain a statement that the donee provided no goods or services in exchange. *Id.* at *6. The Tax Court noted it had "previously held that statement necessary for a charitable contribution deduction." *Id.* (citing *Kendrix v. Comm'r,* 91 T.C.M. (CCH) 666 (2006) and *Castleton v. Comm'r,* 2005 WL 697961 (T.C.2005)). The court rejected the taxpayers' argument that such a statement was only necessary when the donee *actually* furnished goods or services to the donor. *Id.* "The language used is clear and unconditional," the court said. *Id.* Because the taxpayers "failed to provide the contemporaneous written acknowledgements required by section 170(f)(8)," the court held they were not entitled to a deduction. *Id.* at *7. *Friedman* is indistinguishable from this case, and this Court finds the Tax Court's reasoning persuasive. The substantial compliance doctrine does not allow Plaintiffs to circumvent § 170(f)(8)'s unambiguous substantiation requirements. So the Government is entitled to summary judgment on this basis.

This allows the Court to return briefly to the burden of proof regarding Plaintiff's noncash contributions of medical equipment. Because Plaintiffs have failed to comply with § 170(f)(8), they have not "complied with the requirements under this title to substantiate any item," and thus the burden does not shift to the Government under § 7491. Thus, Plaintiffs bear the ultimate burden of proof in their refund action, but the Government bears the burden of "establishing that summary judgment is appropriate as a matter of law." *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir.2002).

2.

■ The second form of documentation required to substantiate non-cash charita-

ble contributions is completion of the appraisal and donee sections of IRS Form 8283. The Revenue Code says, "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." I.R.C. § 170(a)(1). The regulations impose certain "substantiation requirements" for deductions based on noncash charitable contributions in excess of $5,000. Treas. Reg. § 1.170A–13(c)(2). To substantiate such contributions, the taxpayer must (1) "[o]btain a qualified appraisal," (2) "[a]ttach a fully completed appraisal summary ... to the tax return ... on which deduction for the contribution is first claimed," and (3) maintain records in compliance with special rules for certain securities. *Id.* The regulations also require the donee to sign an acknowledgement that it received the property. *Id.* § 1.170A–13(c)(4)(iii). Plaintiffs failed to comply with these regulations when they did not complete IRS Form 8283 for the 2001 and 2003 tax years. In 2001, Plaintiffs listed their $639,195 contribution under Section B of Form 8283, the "Appraisal Summary," but they neglected to have an appraiser or the donee complete the required sections on the form. In 2003, Plaintiffs listed their $365,610 contribution on Section A of Form 8283, the section for contributions of "$5,000 or less." They failed entirely to attach Section B, the Appraisal Summary, to their tax return. So Plaintiffs failed to comply with the regulations' requirements for substantiating charitable contributions of over $5,000.

Plaintiffs' failure to substantiate their 2001 and 2003 deductions means the Government is entitled to partial summary judgment on this basis alone. The Tax Court recently denied substantial deductions where the taxpayers failed to fully comply with the appraisal requirements of Treas. Reg. § 1.170A–13(c). *Mohamed v. Comm'r,* 2012 WL 1937555 (T.C. May 29, 2012). In *Mohamed,* the taxpayers donat-

ed approximately $20 million worth of real property to a charitable trust they created. *Id.* at *1–2. Because the husband was a real-estate broker and certified real-estate appraiser, he used his own appraisals of the property in completing the Appraisal Summary on the Form 8283. *Id.* at *1. He left blank the Declaration of Appraiser, which declared "I am not the donor, the donee, or a party to the transaction" because he recognized he was a party to the transaction. *Id.* He did sign the Donee Acknowledgement, however, in his capacity as trustee of the charitable trust. *Id.* Unfortunately, he read neither the "separate instructions" that accompany Form 8283 nor the Treasury regulations. *Id.* The regulations specifically state the "qualified appraiser" cannot be the donor or the donee. Treas. Reg. § 1.170A–13(c)(5)(iv)(A), (C). Thus, the Tax Court concluded, the taxpayer could not be a "qualified appraiser." *Mohamed,* 2012 WL 1937555 at *4. Furthermore, the court held the incomplete Form 8283 and attached documents did not qualify as an "appraisal summary." *Id.* (citing Treas. Reg. § 1.170A–13(c)(4)(ii)). Finally, the court rejected the taxpayers' argument based on substantial compliance with the regulations. *Id.* at *7–9. The court concluded "substantial compliance requires a qualified appraisal" and such an appraisal was lacking. *Id.* at *8. The court recognized the result was harsh, particularly since the taxpayers had probably undervalued their property. *Id.* at *10. "But," the court concluded, "the problems of misvalued property are so great that Congress was quite specific about what the charitably inclined have to do to defend their deductions...." *Id.*

Although decisions of the Tax Court are not binding on this Court, *Mohamed* is persuasive authority and very relevant to this case. The taxpayers in *Mohamed* complied more extensively with Regulation

§ 1.170A–13(c) than did Plaintiffs here. Unlike the taxpayers in *Mohamed*, Plaintiffs did not even ensure the donee acknowledgement on Form 8283 was completed. And, like the *Mohamed* taxpayers, Plaintiffs attempted to appraise the property themselves, contrary to the requirements of Regulation § 1.170A13(c)(5)(iv)(A). The taxpayer in *Mohamed* was at least a certified real-estate appraiser, therefore meeting the requirement that he "either holds himself or herself out to the public as an appraiser or performs appraisals on a regular basis." Treas. Reg. § 1.170A13(c)(5)(i)(A). But nothing in the record indicates that Plaintiffs, who valued the medical equipment donations to Whitecross, met these qualifications. Plaintiffs, like the taxpayers in *Mohamed*, failed to comply with the regulations' appraisal requirements, and therefore cannot establish entitlement to a refund. *See also Bruzewicz v. United States*, 604 F.Supp.2d 1197, 1205 (N.D.Ill. 2009) (holding an appraisal was insufficient when it did not describe appraiser's background and qualifications as required by Regulation § 1.170A–13(c)(3)(ii)(F)).

■ Plaintiffs try to excuse their noncompliance with the appraisal and donee acknowledgement requirements by arguing the requirements "only pertain to donations in excess of $5,000." They argue that "most of the individual items of medical equipment" had a value of less than $5,000. This argument gets them nowhere. Section B of Form 8283, the Appraisal Summary, instructs the taxpayer to "[l]ist in this section only items (or groups of similar items) for which you claimed a deduction of more than $5,000 per item or group." (*See* Dkt. No. 49–6, at 1.) The

regulations say the value of an item is "the aggregate amount claimed or reported as a deduction ... for such items of property and all similar items of property (as defined in paragraph (c)(7)(iii) of this section)" in the same taxable year. Treas. Reg. § 1.170A–13(c)(1)(i). Paragraph (c)(7)(iii) goes on to define "similar items of property" as meaning "property of the same generic category or type, such as ... land, buildings, ... furniture, electronic equipment, [or] household appliances...." The medical equipment donated to Whitecross was all property of "the same generic category or type," and therefore clearly exceeds the $5,000 threshold in aggregate. So the regulations required an independent appraisal for both the 2001 and 2003 contributions. Because Plaintiffs did not obtain qualified appraisals, they were not entitled to deduct the Whitecross contributions.[7] The Government is entitled to summary judgment on this basis.

**B.**

■ Even if Plaintiffs had complied with the Revenue Code's substantiation, the Government would be entitled to summary judgment based on its first argument-that Plaintiffs have failed to establish their adjusted basis in the medical equipment. "The value of a charitable contribution of property, and thus the value that can be deducted from an income tax return, is reduced by 'the amount of gain which would not have been long term capital gain if the property had been sold by the taxpayer at its fair market value.'" *Jones v. Comm'r*, 560 F.3d 1196, 1199 (10th Cir.2009) (emphasis omitted) (quoting 26 U.S.C. § 170(e)(1)(A)). The statute's wording is not particularly lucid, so a

---

**7.** Plaintiffs also assert, with no evidentiary support or further argument, that "there is a question of fact as to whether any appraisal report requirement was met here." All of the evidence demonstrates Plaintiffs failed to attach a qualified appraisal to their 2001 and 2003 returns. Plaintiff's themselves were disqualified as appraisers as a matter of law. *See* Treas. Reg. § 1.170A–13(c)(5)(iv)(A). So this argument is specious.

little unpacking is helpful. The starting point is the fair market value of the property. Treas. Reg. § 1.170A–1(c)(1) ("If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1)...."). The next step is to subtract from the fair market value any *gain* the taxpayer would have received if he had sold it at its fair market value, unless that gain would have been a long-term capital gain. Determining whether a taxpayer has any gain in property is determined by reference to the taxpayer's adjusted basis in the property. *Jones,* 560 F.3d at 1199. As the Tenth Circuit explained in *Jones,* if a taxpayer has *no* basis in the property, then the taxpayer would receive the entire fair market value as gain in a hypothetical sale. *Id.* "Thus, unless the property was a long term capital asset, § 170(e)(1)(A) would require that the deduction for donating that property be reduced by the property's *entire* value—leaving the taxpayer with no deduction at all." *Id.*

The Government asserts, and Plaintiffs do not dispute, that the gain Plaintiffs would have received by selling the equipment would not have been long-term capital gain. The tax code excludes from the definition of a capital asset property that is used in the taxpayer's trade or business "of a character which is subject to the allowance for depreciation provided in section 167." I.R.C. § 1221(a)(2). Section 167, in turn, allows a depreciation deduction on property "used in the [taxpayer's] trade or business." *Id.* § 167(a)(1). The medical supplies donated to Whitecross fit squarely within § 167's definition, so they cannot be considered capital assets and any gain from selling them would have been ordinary income, not long-term capital gain. Thus, Plaintiffs can only deduct an amount equal to their "cost or basis" in

the equipment donated to Whitecross. *Jones,* 560 F.3d at 1199.

The Government argues Plaintiffs had little or no basis in the medical equipment because Plaintiffs had already depreciated the items or else had expensed them when acquiring them through lease/purchase agreements. The Government submitted documents showing Plaintiffs donated, for example, a TCT–500s scanner and a Radiographic and Fluoroscopy Machine, both of which their company acquired by a lease/purchase agreement. (Dkt. No. 51 at 7–8.) Plaintiffs claimed an adjusted tax basis in the machines of $156,000 and $125,000 respectively. (*Id.*) Yet the Government also attached documents showing one of Plaintiffs' businesses, X–Ray Physicians, had depreciation and equipment rental expenses totaling over $350,000 in the years 1999 and 2000. (Dkt. No. 52 at 2.) Medi–Trans X–Ray Services listed over $60,000 of depreciation and $87,000 equipment rental during 2002 and 2003, and equipment rental of over $200,000 in 2001. (Dkt. No. 51–2 at 1–2.) Records from Orville Diagnostic Imaging show machinery and equipment with a cost basis of $388,784 that had been depreciated down to a "book value" of $280 by the end of 2001. (Dkt. No. 51–1 at 1.) The Government also introduced the deposition of Plaintiffs' accountant, Stephen Miller, who explained that some of Plaintiffs' medical equipment had been "depreciated down to a zero basis" by 2002 and 2003. (Dkt. No. 49–3 at 4.) He said it was "possible" Plaintiffs donated some of this same equipment to Whitecross. (*Id.* at 5.)

 The evidence the Government presents is, of course, insufficient to determine what exactly Plaintiffs' basis was in the donated equipment. The Government does not show that the *specific* pieces of equipment Plaintiffs donated had been depreciated or expensed. But the Govern-

ment does not bear the burden of proof; Plaintiffs do. Unless I.R.C. § 7491 applies and shifts the burden of proof, "the taxpayer has the burden to show not merely that the IRS's assessment was erroneous, but also the amount of the refund to which the taxpayer is entitled." *Dye*, 121 F.3d at 1408. The Government's evidence is certainly sufficient to cast doubt on Plaintiffs' asserted basis in the equipment donated to Whitecross. When the non-movant bears the burden of proof, the "movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir.2000). *See also* Fed. R.Civ.P. 56(c)(1)(B) (allowing a party to show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact"). The Government has more than met its burden.

Plaintiffs, then, "may not rest upon [their] pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Sigmon*, 234 F.3d at 1125. One such "dispositive matter" is Plaintiffs' basis in the donated equipment. Plaintiffs do not respond to the Government's argument that they have not proved their adjusted basis. Instead, they fall back on their argument that the Government cannot raise deficiencies not noted by the IRS, and also assert "there are questions of fact concerning the question of basis." According to Plaintiffs, "The fact that ... no basis argument was

raised by the IRS makes it at least a question of fact to be determined at trial as to whether any alleged basis requirements have been or could be met in this case." As the Court has already discussed, this refund case is a de novo proceeding, and the Government is allowed to raise new arguments. So the IRS examiner's failure to raise the basis issue does not bind the Government in this action. Plaintiffs' argument that fact issues remain ignores their burden on summary judgment. When the moving party has met its burden of production, the non-moving party must "set forth specific facts from which a rational trier of fact could find for the nonmovant." *Herrera*, 506 F.3d at 1309 (internal quotation marks omitted). Here, Plaintiffs have presented no evidence tending to establish their basis in the equipment. Nor have they rebutted the Government's evidence Plaintiffs had depreciated or expensed at least some of their medical equipment. Plaintiffs cannot avoid summary judgment by merely asserting fact issues exist regarding an issue on which they bear the burden at trial. Plaintiffs have failed to come forward with evidence sufficient for a reasonable jury to find their basis established.[8] So the Government is entitled to summary judgment on this independent basis.

### C.

The Government's third alternative argument is that Whitecross is not a charitable organization within the meaning of I.R.C. § 170(c). The Government is entitled to summary judgment on this in-

---

8. Even if Plaintiffs had established their basis in the property, they would run into another problem in valuing the property under § 170(e)(1)(A). A proper calculation under that subsection requires reference to the fair market value of the property. As discussed above, Plaintiffs have failed to establish the fair market value of the property through a qualified appraisal. Some evidence suggests the equipment was worth far less than Plaintiffs appraised it. Whitecross's president, James Bowman, testified that medical equipment of this nature may have "almost no value" after it has been used for a number of years because "the technology has changed." (Dkt. No. 49–4 at 5.)

dependent basis as well. Section 170(c) defines "charitable contribution" as a contribution to a corporation or other entity that (1) is organized in the United States under state or federal law, (2) is organized for a religious, charitable, scientific, literary, or educational purpose, (3) does not allow any net earnings to inure to the benefit of a private individual, and (4) is not disqualified for tax exemption under § 501(c)(3) by reason of attempting to influence legislation or participate in political campaigns. I.R.C. § 170(c)(2). The IRS maintains Publication 78, entitled "Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code." An organization's inclusion in Publication 78 "establishes a presumption that the contribution is tax-deductible." *Branch Ministries v. Rossotti*, 40 F.Supp.2d 15, 19 (D.D.C.1999). Whitecross was not listed in Publication 78 at the time of the contributions. So Plaintiffs have the burden of showing a triable issue with respect to whether Whitecross is a § 170(c) organization.

The Government has introduced some evidence suggesting Whitecross was not a strictly charitable organization. The president of Whitecross said the company never applied for § 501(c)(3) status and filed its tax returns on a Form 1120, rather than a Form 990, which charitable organizations use. (Dkt. No 49–4 at 6–7.) But § 170(c) does not, at least on its face, require a corporation to be organized as a § 501(c)(3) organization in order to receive deductible contributions. So these facts are not particularly probative of Whitecross's qualifications under § 170(c). But the Government also asserts Plaintiffs "have not produced evidence to raise a question of fact" regarding whether Whitecross was qualified to receive charitable contributions.

Plaintiffs try to meet their burden by pointing to a number of facts. First, they point to Whitecross's articles of incorporation, which state, "The corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code...." (Dkt. No. 56–2 at 1.) Second, they say Whitecross promoted itself as a charitable organization "on its website and with various other charitable organizations." Third, Plaintiffs assert, without citation to supporting documents, that Whitecross was "merely a conduit" to direct charitable contributions to medical missions work. They also say "there is substantial evidence that much of the medical equipment ... did in fact end up with various charitable organizations in the medical missions." Plaintiffs do not take the trouble to identify this "substantial evidence." In fact, the evidence the Government introduced shows not only that one of the donated x-ray machines likely went to a § 501(c)(3) organization, but also that Whitecross sold some equipment "into the commercial market." (Dkt. No. 49–4 at 10.) Whitecross's president testified that Whitecross passed along none of the equipment from Plaintiffs to § 501(c)(3) organizations or churches except the x-ray machine. (*Id.* at 11.)

These facts, however, are largely irrelevant to whether Whitecross is a charitable organization under § 170(c). And Plaintiffs have not met their burden of production with respect to some of the statute's requirements. They have met their burden as to § 170(c)'s first requirement that Whitecross be a corporation organized under state law. Plaintiffs submitted Whitecross's articles of incorporation, which demonstrate it was organized under Kentucky law. (Dkt. No. 56–2 at 1.) They have also met their burden of producing evidence that Whitecross was organized for a charitable purpose. The corporation's articles say it was "organized and operated exclusively for charitable pur-

poses." (*Id.*) But Plaintiffs offer no evidence with respect to the statute's final two requirements—that no net earnings inure to a private individual's benefit and that the corporation does not participate in political activity. Without more, the Court cannot conclude a triable issue of fact exists. So Defendants are entitled to partial summary judgment on this alternative ground.

## D.

■ The Court turns now to Plaintiffs' alternative theory regarding the Whitecross contributions—the theft loss theory. The Government makes two alternative arguments in response to this theory. First, it says Plaintiffs have failed to establish a basis in the alleged stolen property. Second, it argues the transfer of property did not constitute a theft within the meaning of I.R.C. § 165. The Government's first argument is correct; its second is not.

### 1.

Section 165 allows a deduction for theft losses sustained during the taxable year and not compensated for by insurance or otherwise. I.R.C. § 165(a), (e). The amount of the deduction is the lesser of (1) the loss in value as a result of the theft or (2) the taxpayer's adjusted basis. *Id.* § 165(b); Treas. Reg. §§ 1.165–7(b)(1), 1.165–8(c). Plaintiffs run into exactly the same problem with their theft loss theory as with the charitable contribution theory—they have not introduced *any* evidence to establish their adjusted basis. On the evidence before the Court, a jury would not be able to find Plaintiffs had any basis in the medical equipment, whether donated or stolen. So the Government is entitled to summary judgment on Plaintiffs' alternative theft loss theory.

### 2.

The Government's second argument does not fare as well as its first. The

Government concedes that to qualify as a theft loss, a taxpayer need only show his loss resulted from the illegal and intentional taking of property. *See* Rev. Rule 72–112, 1972–1 C.B. 60. Under the laws of Ohio, where the alleged theft occurred, it is illegal to solicit contributions for a charitable organization by misleading any person as to any material fact. Ohio Rev. Code Ann. § 1716.14. The Government argues, however, that the evidence is insufficient to establish intent to deceive because Plaintiffs "have testified that they cannot recall James Bowman, the president of Whitecross with whom they dealt, ever making any representations that the organization was a § 501(c)(3) organization or that the donations would be tax deductible." The Government is incorrect. Dr. Riether asserted he had a telephone conversation with Bowman in which Bowman "told me that Whitecross was a charitable organization under Section 501(c)(3) of the Internal Revenue Code and that any donation made to Whitecross would be tax deductible." (Dkt. No. 56–1 at 5–6.) Bowman's alleged statement that contributions to Whitecross were deductible is enough to raise a triable issue regarding Bowman's intent to deceive. So the Government cannot prevail on this argument, but it is nevertheless entitled to summary judgment because Plaintiffs have not shown a triable issue with respect to their adjusted basis.

## IV.

■ The next deductions at issue are those based on the donation of the Chevrolet vans to Frontline Ministries and Cornerstone Chapel. Plaintiffs complied with nearly all of the statutory and regulatory substantiation requirements when they donated the vans. They obtained an independent appraisal and had the appraiser complete the "Declaration of Appraiser" on each Form 8283. They had Corner-

stone and Frontline complete the "Donee Acknowledgement" section on both forms as well. And both charities complied with § 170(f)(8)(A)'s contemporaneous written acknowledgement requirement.

Nevertheless, the Government argues Plaintiffs did not adequately substantiate the van contributions because they failed to submit a "qualified appraisal" as defined by Treas. Reg. § 1.170A–13(c). That provision in the regulations requires a qualified appraisal to include the following: (1) a detailed description of the property, (2) the physical condition of the property, (3) the date of contribution, (4) the terms of any agreement by the donor or donee relating to the use, sale, or disposition of the property, (5) the name, address, and identification number of the appraiser, (6) the appraiser's qualifications, including background, experience, education, and membership in professional appraisal organizations, (7) a statement he prepared the appraisal for income tax purposes, (8) the date on which he appraised the property, (9) the appraised fair market value of the property on the date of contribution, (10) the method of valuation used, and (11) the specific basis for the valuation, such as comparable sales transactions or statistical sampling. *Id.* § 1.170A–13(c)(3)(ii). Here, the letter from appraiser James McLaughlin lacked most of the required information. The letter described the vans and indicated their retail and wholesale values, and stated, "[W]e have determined a value for the two Chevrolet vans listed below." (Dkt. No. 49–12 at 2.) The letter said nothing about Mr. McLaughlin's qualifications or methods, or that he performed the appraisal for income tax purposes. In short, Plaintiffs did not comply with the regulations' substantiation requirements, and therefore they cannot avail themselves of § 7491's burden-shifting scheme. More importantly, their failure to comply with the regulations means they were not entitled to a charitable deduction for the vans.

The Government also asserts Plaintiffs failed to establish their basis in the vans. Plaintiffs acquired the vans through lease/purchase agreements. (Dkt. No. 49–2 at 8.) But Plaintiffs have not substantiated their adjusted basis in the vans, and the evidence is unclear whether they already reduced their basis in the vans through either expensing or depreciation. So Plaintiffs are not entitled to a deduction for the vans for the additional reason that they have not produced evidence from which a jury could determine their adjusted basis in the vans.

V.

The Court turns now to Plaintiffs' liability for self-employment tax for the 2006 tax year. The tax code defines self-employment earnings as "the gross income derived by an individual from any trade or business carried on by such individual … plus his distributive share (whether or not distributed) of income … from any trade or business carried on by a partnership of which he is a member…." I.R.C. § 1402(a). The question in this case is whether Plaintiffs must treat the distributive income from New Mexico Diagnostic Imaging, LLC, as partnership income subject to self-employment tax. LLCs are not partnerships for purposes of state law, but they share some attributes of partnerships. The treasury regulations allow noncorporate business entities such as LLCs to elect their classification for federal tax purposes. Treas. Reg. § 301.7701–3(a). An eligible entity with at least two members can elect to be treated as either a corporation or a partnership. *Id.* If an eligible entity does not file an election, however, it is treated as "[a] partnership if it has two or more members." *Id.* § 301.7701–3(b)(1)(i).

New Mexico Diagnostic Imaging has only two members—Plaintiffs. The LLC

did not elect to be treated like a corporation for federal tax purposes. Thus, by default it must be treated as a partnership, and any of Plaintiffs' earnings from that partnership are self-employment income. So Plaintiffs were required to treat the $76,986 of distributive income as self-employment income and pay the self-employment tax.

Plaintiffs' only response to the Government's argument is a simplistic syllogism. They say: "Dr. & Mrs. Riether each received a Form W–2 from their employer, New Mexico Diagnostic Imaging, LLC, for the year 2006. Thus, they were not self-employed." This argument is interesting, but unpersuasive. Plaintiffs tried to treat themselves as employees for *some* of the LLC's earnings, by issuing themselves $51,500 in wages ($25,750 to each), while simultaneously treating themselves as partners for *the rest* of the LLC's earnings, by issuing themselves Schedules K–1 for $76,986 ($38,493 to each). (*See* 2006 Form 1040 at lines 7, 17 (Dkt. No. 50–1 at 1); 2006 Form 1065 (Dkt. No. 53–2 at 2–3).) The income at issue is not the income they treated as "wages," but the income they treated as their distributive share of partnership income. Plaintiffs' characterization of some of the income as wages does not change the character of the remaining income.

In fact, Plaintiffs should have treated *all* the LLC's income as self-employment income, rather than characterizing some of it as wages. Revenue Ruling 69–184 says "members of a partnership are not employees of the partnership" for purposes of self-employment taxes. Rev. Rul. 69–184, 1969–1 C.B. 256. Instead, a partner who participates in the partnership business is "a self-employed individual." *Id.* Because Plaintiffs did not elect the benefits of corporate-style taxation under Treasury Regulation § 301.7701–3(a), they should not have treated themselves as employees in

distributing the remaining $51,500 of the LLC's income. The IRS made no bones about this, however, presumably because Plaintiffs had paid self-employment tax on that income through withholding. But the LLC's improper treatment of the "wage" income further undermines Plaintiffs' simplistic argument that they owed no self-employment taxes simply because they received W–2s.

Plaintiffs also claim, with no citation to authority, that the $76,986 in LLC reported on the Schedules K–1 "is unearned income. It is not subject to the self-employment tax." The magic words "unearned income" won't do the trick. The Revenue Code says the self-employment tax applies to a taxpayer's distributive share of partnership income. I.R.C. § 1402(a). Only one relevant exception exists, and it applies to limited partners. Net income from self-employment does not include

> the distributive share of any item of income or loss of a limited partner ... other than guaranteed payments ... to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services.

*Id.* § 1402(a)(13). For a taxpayer treated as a general partner, however, the distributive share of partnership income is subject to self-employment tax "irrespective of the nature of his membership." Treas. Reg. § 1.1402(a)–2(g). *See also Ding v. Comm'r*, 74 T.C.M. (CCH) 708 at *2 (1997) (noting that partnership earnings other than those received by a limited partner generally constitute self-employment income). Plaintiffs are not members of a limited partnership, nor do they resemble limited partners, which are those who "lack management powers but enjoy immunity from liability for debts of the part-

nership." *Renkemeyer, Campbell & Weaver, LLP v. Comm'r*, 136 T.C. 137, 147 (2011). Thus, whether Plaintiffs were active or passive in the production of the LLC's earnings, those earnings were self-employment income. Summary judgment is appropriate on this issue.

## VI.

█ The final issue awaiting resolution is whether Plaintiffs should be refunded the substantial underpayment penalty of $7,599. The IRS imposed the penalty based solely on Plaintiffs 2006 tax return. That return, of course, included rollover deduction for charitable contributions made in prior years. The Revenue Code authorizes the IRS to assess a 20% penalty against a taxpayer for certain underpayments of taxes. I.R.C. § 6662(a). Two ways to merit a penalty are "[n]egligence or disregard of rules or regulations" and "[a]ny substantial understatement of income tax." *Id.* § 6662(b)(1), (2). An understatement is substantial if it exceeds the greater of $5,000 or ten percent of the tax required to be shown on the return. *Id.* § 6662(d)(1)(A). Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title." *Id.* § 6662(c). The Government "bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case." *Woodsum v. Comm'r*, 136 T.C. 585, 590–91 (2011) (citing I.R.C. § 7491(c)). "Once the [Government] meets this burden, the taxpayer must come forward with persuasive evidence that the [Government's] determination is incorrect." *Id.* at 591.

A taxpayer may avoid the penalty if he can show reasonable cause for the underpayment and that he acted in good faith.

I.R.C. § 6664(c)(1). One way to meet this requirement is by showing "[r]eliance on . . . professional advice," which "constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664–4(b)(1). The regulations define "advice" as "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly. . . ." *Id.* § 1.6664–4(c)(2).

The Government argues the $7,599 penalty is justified based on either the substantial understatement provision or negligence. Plaintiffs make three arguments in response. First, they assert no deficiency existed, an argument this Court has already rejected. Second, they say that "the elements of the penalty are not met." Third, they argue that "even if the statutory criteria had been met, there was reasonable cause for any understatement that occurred," because they relied on their certified public accountant, Stephen Miller, in filing their 2006 tax return.

The Government adequately demonstrated the elements necessary for a substantial understatement. The IRS originally determined a tax deficiency for 2006 of $37,998. (Dkt. No. 52–7 at 2.) The Government now asserts that the amount of tax due, after taking into account the errors it concedes, is approximately $18,695.[9] Plaintiffs have not disputed this amount. Nor have they disputed that they only reported their 2006 tax liability as $4,737. Thus, the amount of the understatement was approximately $13,958, the difference between the two numbers. This

---

**9.** If this amount is correct, then Plaintiffs' actual tax deficiency was only $13,958, and the appropriate 20% penalty was only $2,791. The parties will have opportunity to determine the exact amount as they proceed in this case.

understatement was clearly greater than $5,000, and it is approximately 75% of the "tax required to be shown on the return." I.R.C. § 6662(d)(1)(A)(i). So the Government has easily demonstrated a substantial understatement.

The harder question is whether Plaintiffs can show reasonable cause and good faith for the understatement. The Tax Court has developed a three-pronged test for determining whether reasonable cause exists. This Court considers the Tax Court's test a persuasive interpretation of § 6664 and its accompanying regulations. The taxpayer must show "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 99 (2000), *aff'd* 299 F.3d 221 (3d Cir.2002). Plaintiffs have satisfied the first prong, because they point out that Stephen Miller had been a certified public accountant in Ohio for over 42 years as of 2012. (Dkt. No. 56–10 at 1.)

As to the second prong, Plaintiffs have not shown they provided Mr. Miller with adequate documentation of their basis in the medical equipment. The Government produced Mr. Miller's deposition, in which he conceded it was "possible" that some of the items donated by Plaintiffs had been "depreciated to the point where they had a zero basis." (Dkt. No. 49–3 at 5.) Mr. Miller could not remember whether he had been able to compare the list of donated equipment with the equipment he knew was depreciated to zero. (*Id.*) Plaintiffs have not shown anything in their response to summary judgment suggesting they supplied Mr. Miller with adequate information to determine the adjusted basis of the donated equipment. So they cannot satisfy the second prong.

Turning to the third prong, Plaintiffs have not shown they relied, directly or indirectly, on any particular "communication" by Mr. Miller. Plaintiffs attached an affidavit from Mr. Miller, in which he stated he prepared Plaintiffs' 2006 income tax return "in accordance with the law and all applicable regulations." (Dkt. No. 56–10 at 4.) But Plaintiffs do not introduce any evidence that Mr. Miller communicated any "analysis or conclusion" to them regarding the deductibility of the charitable contributions or the need to pay self-employment tax on the LLC earnings. *See* Treas. Reg. § 1.6664–4(c)(2). In his deposition, Mr. Miller indicated he had no written correspondence with Plaintiffs regarding their adjusted basis in the equipment. (Dkt. No. 49–3 at 4.) Plaintiffs' affidavits only indicate they "reviewed the 2006 income tax return prepared for us by CPA Stephen Miller, accepted and signed it." (Dkt. No. 56–1 at 13.) This is not enough to establish that they relied on his professional advice. Treas. Reg. § 1.6664–4(c)(2). *See also Howard v. Comm'r*, 931 F.2d 578, 582 (9th Cir.1991).

The Tax Court's decision in *Woodsum* is instructive. There, the founder of an equity investment firm who was "financially sophisticated" and had "a basic understanding" of tax concepts engaged in a complicated financial transaction from which he received income. *Woodsum*, 136 T.C. at 586. In 2006, the taxpayer and his wife received an adjusted gross income of almost $33 million, including $3.4 million from the transaction. *Id.* at 588. The couple's income from the year was reported on more than 160 tax-related forms. *Id.* The couple gave these forms to a specialty tax firm, and the firm prepared a tax return, but somehow omitted the $3.4 million payment. *Id.* at 589. The taxpayers met with a representative from the tax firm to look over their return and sign it, though they could not remember what is-

sues they discussed. *Id.* When the IRS discovered the mistake, it determined a tax deficiency and imposed a penalty under § 6662(a). *Id.* The Tax Court assumed that when the taxpayers signed their return they were "unaware of the omission of the $3.4 million." *Id.* at 590. The court nevertheless concluded the penalty was appropriate. *Id.* at 593. The court said the taxpayers presented "no testimony of the preparer (nor any other evidence) to show that the income was omitted from the return because of any 'analysis or conclusion' or 'judgment' by [the tax firm] that the income was not taxable." *Id.* at 593. Because the omission resulted merely from the tax firm's mistake rather than its "professional *advice*," the taxpayers could not rely on the reasonable cause exception. *Id.* at 594.

This case differs somewhat from *Woodsum* in that the mistake on Plaintiffs' 2006 tax return was not the omission of income. But the carryover deductions on the return did result from obvious omissions in prior returns. Both the 2001 and 2003 returns, which Plaintiffs also reviewed and signed, left the Declaration of Appraiser and Donee Acknowledgment blank, omissions that would be obvious even to an untrained eye. More importantly, this case is similar to *Woodsum* because Plaintiffs have introduced *no* evidence they actually relied on Mr. Miller's "analysis or conclusion" about the tax return. Plaintiffs apparently received no "advice" regarding how to substantiate their charitable deductions or whether they owed self-employment tax on the LLC income. Unfortunately for Plaintiffs, "the mere fact that a certified public accountant has prepared a tax return," competently or otherwise, does not mean the accountant has offered an opinion or advice. *Neonatology Assocs.*, 115 T.C. at 100. This is because the regulations require reliance on a "communication" from a professional that sets forth the professional's "analysis or conclusion." Treas. Reg. § 1.6664–4(b)(1).

Plaintiffs try to salvage their argument by citing three cases, all of which are inapposite. First, they cite *Derby v. Comm'r*, 99 T.C.M. (CCH) 1271 (2010), where the Tax Court invalidated a § 6662 penalty. *Derby* involved an unsophisticated taxpayer who hired a tax and business service not only to file his tax returns, but also to maintain his books and records. *Id.* at *1. In that situation, the court held the taxpayer "took reasonable efforts to assess his proper tax liability and reasonably relied on [the tax preparer's] expertise." *Id.* at *2. In *Espinoza v. Comm'r*, 99 T.C.M. (CCH) 1219 at *4 (2010), the court rejected a § 6662 penalty where the taxpayer relied on the explicit advice of an attorney that certain settlement proceeds were non-taxable. The present case is unlike *Espinoza* because Plaintiffs did not rely on a professional's "analysis or conclusion." Finally, Plaintiffs cite *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F.Supp.2d 885, 894 (E.D.Tex.2007), which is inapposite because it involved tax shelters that obtained a "detailed opinion letter" from tax attorneys at a large corporate law firm concerning the propriety of claiming certain tax losses. Here, Plaintiffs have not shown evidence of any advice on which they relied. So they cannot avoid the underpayment penalty. Accordingly, they are not entitled to a full refund of the penalty, but only a partial refund based on the errors the Government now concedes.

## VII.

The Court GRANTS the Government's motion for partial summary judgment. The magistrate judge shall set a scheduling conference to deal with the remaining issues in this case. As the Court sees it, the unresolved issues are: (1) Plaintiffs'

entitlement to a refund based on the Government's conceded error in denying the $5,980 withholding tax credit and assessing $38,100 in unreported income from retirement distributions, and (2) Plaintiff's entitlement to a refund based on recalculating the substantial underpayment penalty to account for these two errors.