# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE P3 HEALTH GROUP ) Consol. C.A. No. 2021-0518-JTL
HOLDINGS, LLC )

## OPINION

Date Submitted: July 13, 2022
Date Decided: September 12, 2022

Bruce E. Jameson, Corinne Elise Amato, Eric J. Juray, Elizabeth Wang, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Craig Carpenito, Richard H. Walker, Samuel C. Cortina, KING & SPALDING LLP, New York, New York; *Counsel for Hudson Vegas Investment SPV, LLC*.

William M. Lafferty, Kevin M. Coen, Ryan D. Stottmann, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Jessica Puathasnanon and P3 Health Group Holdings, LLC*.

Kevin R. Shannon, Christopher N. Kelly, Daniel M. Rusk IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Chicago Pacific Founders Fund, L.P., CPF P3 Splitter, LLC, Greg Kazarian, Larry Leisure, Mary Tolan, and Sameer Mathur*.

Elena C. Norman, Paul J. Loughman Lakshmi A. Muthu, Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; *Counsel for Sherif W. Abdou, Amir Bacchus, Gary Garrett, Lorie Glisson, Taylor Leavitt, and Tom Price*.

**LASTER, V.C.**

Jessica Puathasnanon served as the general counsel and chief legal officer of P3 Health Group Holdings, LLC, a Delaware limited liability company ("P3" or the "Company"). In this action, Hudson Vegas Investment SPV, LLC ("Hudson") has sued various defendants, including Puathasnanon. Hudson asserts that Puathasnanon breached the fiduciary duties she owed to the Company and its members in her capacity as an officer of the Company.

Puathasnanon contends that the court cannot exercise personal jurisdiction over her. She has moved for dismissal under Rule 12(b)(2).

A proper exercise of personal jurisdiction requires a valid means of serving the defendant, and the resulting exercise of jurisdiction must provide the defendant with the protections afforded by minimum standards of due process. Hudson argues that a valid means of service exists under the implied consent provision in the Delaware Limited Liability Company Act (the "LLC Act"), 6 *Del. C.* § 18-109(a), which establishes a mechanism for serving process on a manager of a limited liability company ("LLC"). Hudson argues that as a senior officer of a Delaware LLC who voluntarily assumed that role, Puathasnanon implicitly consented to jurisdiction in the Delaware courts and has sufficient contacts with Delaware to satisfy due process.

Section 18-109(a) classifies two categories of persons as managers. First, there are persons whom the governing LLC agreement formally names as managers (a "formal manager"). Second, there are persons who "participate[] materially in the management of the limited liability company," *id.*, regardless of whether the governing LLC agreement

formally names them as managers (an "acting manager").

Puathasnanon was not a formal manager, but the pleading-stage record supports a reasonable inference that she was an acting manager. Under the plain language of the material participation requirement, a person qualifies as an acting manager if the person participates in the management of the entity in a significant way. The complaint supports a reasonable inference that by acting as the general counsel and chief legal officer of the Company, Puathasnanon participated materially in the management of the Company.

The exercise of personal jurisdiction over Puathasnanon comports with minimum standards of due process. Individuals who take positions as senior officers of Delaware entities do so with the understanding that personal jurisdiction exists in the Delaware courts to adjudicate disputes over compliance with their contractual or fiduciary obligations. For Delaware corporations, the consent-to-jurisdiction statute names the chief legal officer explicitly as a senior officer who consents to personal jurisdiction in Delaware. 10 *Del. C.* § 3114. An LLC is a primarily contractual entity whose internal governance can take many forms. The LLC Act therefore does not frame its consent-to-jurisdiction statute in terms of standard positions or titles. It rather speaks in terms of formal managers and acting managers. That usage is encompassing, not limiting. Just as the corporate consent-to-jurisdiction statute reaches C-suite executives, including the chief legal officer, the LLC Act's consent-to-jurisdiction statute reaches C-suite executives, including the chief legal officer.

Puathasnanon has suggested that despite her significant titles, she did not participate materially in the management of the Company. When arguing for her

2

dismissal from this action, she claims to have functioned as a ministerial drone. It seems doubtful that Puathasnanon would make a similar claim on her resume or in an annual self-evaluation, but she has made it in this case.

At the pleading stage, the customary roles and responsibilities associated with Puathasnanon's titles provide a sufficient basis for the assertion of personal jurisdiction. In addition, the operative complaint supports an inference that Puathasnanon acted in a manner consistent with her roles and participated significantly in the management of the Company.

At a minimum, Hudson would be entitled to jurisdictional discovery to explore the extent of Puathasnanon's material participation. In some cases, it may make sense to have a separate phase of jurisdictional discovery to investigate a defendant's contacts with the forum state. Here, there is no need for a separate phase of jurisdictional discovery, because the existence of personal jurisdiction turns on Puathasnanon's involvement with the transaction at the heart of the case. Jurisdictional discovery therefore will overlap substantially with merits discovery.

The complaint accordingly supports a reasonable inference that personal jurisdiction exists over Puathasnanon. Her motion under Rule 12(b)(2) is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the plaintiff's complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations

are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.[1]

## A.   The Company

Before the events challenged in this litigation, P3 was a population health management company with operations in Nevada, Arizona, Florida, and Oregon. The Company sought to offer cost-effective long-term care for patient-members. It was a privately held entity controlled by the Chicago Pacific Founders Fund, L.P. ("Chicago Pacific"), a private equity fund.[2]

The Company's limited liability company agreement (the "LLC Agreement") created a manager-managed governance structure with a board of up to eleven managers (the "Board"). The LLC Agreement empowered the Board to manage the business and affairs of the Company, stating:

> [T]he Board shall conduct, direct and exercise full control over all activities of the Company (including all decisions relating to the issuance of additional Equity Securities and the voting and sale of, and the exercise of

---

[1] Citations to exhibits ("Ex. —") refer to documents attached to the amended complaint. Citations in the form "AC ¶ —" refer to allegations in Hudson's amended complaint. Citations in the form "PX __" refer to exhibits from Hudson's previous motion for a preliminary injunction. Citations in the form "DX __" refer to exhibits from defendants' opposition to the motion for a preliminary injunction. Citations in the form of "Tr. __" refer to the transcript from oral argument on the motion to stay and motions to dismiss.

[2] Chicago Pacific also held interest in the Company through two related entities, CPF P3 Splitter, LLC and Chicago Pacific Founders, LLC. *See* Dkt. 100 at 4 n.9. CPF P3 Splitter, LLC and Chicago Pacific Founders, LLC served primarily to help effectuate the proposed transactions involved in this litigation. *See* PX 126 at '117–26. The distinctions among the entities are immaterial to this decision, which for simplicity refers to Chicago Pacific.

other rights with respect to, the equity securities of its Subsidiaries), and (ii) the Board shall have the sole power to bind or take any action on behalf of the Company, or to exercise any rights and powers (including, without limitation, the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments or other decisions) granted to the Company under this Agreement or any other agreement, instrument, or other document to which the Company is a party.

Ex. 1 § 5.1(a)(i).

The LLC Agreement allocated the rights to appoint members of the Board as follows:

- Chicago Pacific had the right to designate five managers (the "Chicago Pacific Managers").

- Leavitt Equity Partners ("Leavitt") had the right to designate one manager.

- Hudson had the right to designate two managers (the "Hudson Managers").

- Each of the Company's co-founders had the right to designate a manager.

- The holders of the Company's remaining voting power had the power to elect one manager.

Chicago Pacific and Leavitt jointly held all of the Company's Class A Units, and the LLC Agreement designated their managers as the "Class A Managers." Ex. 1 § 5.2(a)(ii). Hudson alleges that Chicago Pacific and Leavitt worked together to control a majority of the Board and to exercise control over the Company. That is a reasonable inference to draw at this stage.

The LLC Agreement granted the Board the power to delegate authority to officers. Section 5.4 of the LLC Agreement stated:

The Board may (but need not), from time to time, designate and appoint one or more persons as an Officer of the Company. … Any Officers so

5

designated shall have only such authority and perform only such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular Officers and, unless the Board otherwise decides, if the title is one commonly used for officers of a business corporation formed (*e.g.*, chief executive officer, president, chief operating officer, chief financial officer), the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office . . .

*Id.* § 5.4.

Through this arrangement, the LLC Agreement created a governance structure in which the role of the Company's officers closely resembled the officers of a corporation. The LLC Agreement emphasized the parallel by stating explicitly that the officers owed fiduciary duties to the Company and its members that were of "the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware." *Id.* § 5.6(d).

## B.     The Original Deal Structure

In August 2020, the Company began exploring ways to access the public market. Dkt. 100 at 9. On September 1, several members of the Board participated in a Zoom meeting on that subject. PX 8 at '152. The meeting materials listed a potential combination with another Chicago Pacific portfolio company as one of the options. *Id.* at '155

On November 1, 2020, the Company's co-founders and one of the Chicago Pacific Managers met with Greg Wasson, the president and co-founder of Wasson Enterprise, his family office. PX 10. At the meeting, the Company's representatives discussed the benefits of going public by merging with a special purpose acquisition company

("SPAC"). *See* PXs 11–12. One possibility was for Wasson to create a SPAC, use it to raise public capital through an initial public offering, and then engage in a merger with the Company.

By late November 2020, the Company's representatives and Wasson were discussing a potential three-way merger involving a SPAC, the Company, and another portfolio company controlled by Chicago Pacific (the "Original Deal Structure"). AC ¶ 32. Chicago Pacific and Wasson thoroughly analyzed the potential transaction, including detailed financial models for the combined company. AC ¶ 36. They also discussed an optimal timeline for the transaction. *Id.* By December, the parties were ready to move forward with the Original Deal Structure. *Id.* ¶ 32.

Because the Original Deal Structure contemplated a transaction between the Company and another Chicago Pacific portfolio company, the transaction required Hudson's approval. Among other things, the LLC Agreement provided as follows:

> Without the approval of [Hudson], the Company will not, and will not permit any Subsidiary to . . . enter into any transaction or series of related transactions (including a Sale of the Company) with any CPF Member or Affiliate of any CPF Member, including without limitation compensation or equity arrangements with any members of the Board or principals, employees or operating partners of any CPF Member or any Affiliate of a CPF Member[.]

Ex. 1 § 6.9(c) (the "Affiliated Transaction Provision"). The other portfolio company qualified as an "Affiliate of any CPF Member," so the Original Deal Structure required Hudson's consent.

In early January 2021, the Chicago Pacific Managers proposed a transaction to the Board that contemplated the Original Deal Structure. Around the same time, Wasson

7

formed a SPAC called Foresight Acquisition Corp. ("Foresight"). PX 19 at 2. Foresight filed its Registration Statement on Form S-1 with the SEC, and its shares began trading publicly on NASDAQ under the ticker symbol "FORE." *Id.* at 12.

Hudson did not like the economics that the Original Deal Structure contemplated. Shortly after the Chicago Pacific Managers proposed the Original Deal Structure, Hudson exercised its contractual veto under the Affiliated Transaction Provision.

## C. The New Deal Structure

After Hudson exercised its veto, Chicago Pacific, the Company's officers, and Foresight began exploring an alternative transaction that would not trigger the Affiliated Transaction Provision. They decided to pursue a merger that only would involve the Company and Foresight (the "New Deal Structure"). The New Deal Structure would not involve the other Chicago Pacific portfolio company, thereby avoiding the obvious trigger for the Affiliated Transaction Provision. But Chicago Pacific, the Company's officers, and Foresight had not given up on their goal of combining the Company with the other portfolio company. They merely envisioned taking that step down the road, in a follow-on transaction, after the dust had settled from the merger between Foresight and the Company.

As the Company's general counsel and chief legal officer, Puathasnanon participated significantly in these events. Over the following months, she provided advice to the Board, and she reviewed and assisted in the preparation of materials for the Board. She was responsible for documenting the actions that the Board took by preparing and circulating minutes for the Board's meetings. She also assisted in preparing and

8

commenting on the disclosures that the Company provided to its investors in connection with the transaction.

For example, during March 2021, Foresight and Chicago Pacific negotiated a letter of intent. *See* AC ¶ 43. On March 25, Puathasnanon circulated the proposed letter of intent to the Board and provided an update regarding the negotiations. PX 83. She advised the Board that Foresight was prepared to sign the letter of intent, and she asked the members of the Board to authorize the Company's officers to sign as well. AC ¶¶ 43–44. The Board gave its approval by the end of the day. AC ¶ 48.

The letter of intent implied a post-transaction entity valuation of $3.3 billion. AC ¶ 49. It also contemplated a transaction in which the governing agreements of the post-transaction entity would not provide Hudson with the rights and protections that Hudson enjoyed under the LLC Agreement.

After seeing the proposed letter of intent, the Hudson Managers objected to the transaction. Puathasnanon then worked with Latham & Watkins LLP ("Latham"), the Company's outside counsel, on a response to Hudson's concerns. Puathasnanon instructed Latham to remove language in the draft letter that referred to the proposed transaction as a "capital raise" because it "could be used against us." PX 103. She also sought Latham's advice on the extent of information that the Company needed to provide to the Hudson Managers, with the goal of giving them only what was strictly necessary. *See* AC ¶ 48; PX 109–10. Over the ensuing weeks, the Hudson Managers remained in the dark as the transaction process advanced. *See* AC ¶¶ 32, 45, 48. It was not until May 2021 that Puathasnanon began to recommend sharing more information with the Board.

On May 6, she advised a subset of the Chicago Pacific Managers that "we should start providing the full Board with detailed information about the transaction so that when it comes time for a formal vote . . . everyone is well-informed and able to vote accordingly." PX 123. According to the complaint, that did not happen. *See* AC ¶¶ 76–81.

Because of the lack of information flowing to the Board, the Hudson Managers did not learn about important transactional developments in real time. For example, Chicago Pacific and Foresight contemplated using a standard de-SPAC transaction structure. One component of that structure involves raising additional capital through a private investment in public equity ("PIPE") transaction. Chicago Pacific and Foresight originally contemplated raising $500 million through the PIPE. In April 2021, however, the SPAC market declined, and the anticipated proceeds from the PIPE fell to $208 million. AC ¶¶ 31, 67. Chicago Pacific and Foresight continued moving forward, notwithstanding the funding concerns, and without informing the Board.

A similar event took place in early May 2021, when Foresight reduced the value it ascribed to the post-transaction entity to $2.3 billion. The new mark reflected a decline of approximately $1 billion—or more than a third—from the valuation of $3.3 billion that formed the basis for the letter of intent. AC ¶ 71. Chicago Pacific and the Company's officers moved forward at the lower valuation without discussing it with the full Board.

**D.      The Board Approves The Merger.**

On Thursday, May 20, 2021, Puathasnanon emailed the full Board in anticipation of two meetings at which the Board would receive information about the transaction

between the Company and Foresight (the "Merger"). The first meeting would take place the next day, on Friday, May 21. The second meeting would take place two days after that, on Sunday, May 23. *Id.* ¶ 77.

Puathasnanon's email attached an executive summary describing the Merger, a deck explaining the steps involved in effectuating the Merger, and the most recent draft of the agreement governing the transaction. *Id.* The materials described a complex "Up-C" structure that would be used to implement the Merger. PX 136 at '452, '552–62. The materials noted that the Company would merge with and into a newly formed LLC ("MergerCo") that was a subsidiary of Foresight. Notably, MergerCo would be the Company surviving the Merger. *See id.* at '562; Dkt. 100 at 22. Depending on the class of units of the Company that a member held, the merger consideration would consist of a combination of cash, units in MergerCo, and publicly traded shares of Foresight. *See* PX '552–62.

The Board scheduled an additional meeting for 7:00 a.m. on Tuesday, May 25, 2021, in case they needed extra time to "finalize the documents before approval." PX 136 at '786. During this meeting, the Board planned to consider whether to approve the Merger.

At 1:41 a.m. on May 25, 2021, Puathasnanon circulated a set of finalized documents for the Board to consider when it met less than six hours later. AC ¶ 80. When the Board met, a majority of the Board approved the Merger. The Hudson Managers abstained, citing a lack of time to review the final documents. *Id.* ¶ 82.

11

**E.      This Litigation**

On June 11, 2021, Hudson filed this lawsuit and sought a preliminary injunction against the Merger. The parties conducted expedited discovery, and Hudson presented its preliminary injunction application.

On September 14, 2021, the court denied Hudson's request for a preliminary injunction of the Merger. The court held that Hudson had failed to show a reasonable likelihood of success on any claim that could not be addressed after the closing of the Merger. As a result, Hudson had failed to make the showing of irreparable harm necessary to support an injunction. *See* Dkt. 116 at 34.

On December 3, 2021, the Merger closed. Hudson then filed an amended complaint.

Counts IX and X of the amended complaint assert that Puathasnanon breached her fiduciary duties as an officer by excluding the Hudson Managers from the process that led to the Merger, misrepresenting the legal advice that the Company received from outside counsel, and providing misleading information to the Hudson Managers. AC ¶¶ 155–64.

## II.      LEGAL ANALYSIS

Puathasnanon has moved for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a valid method of serving process. Second, the exercise of personal jurisdiction must rest on sufficient minimum contacts between the defendant and Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## A.     Service of Process

As a method of serving process, Hudson relies on Section 18-109(a) of the LLC Act. In relevant part, it states:

> A manager . . . may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company, whether or not the manager . . . is a manager . . . at the time suit is commenced.
>
> A manager's . . . serving as such constitutes such person's consent to the appointment of the registered agent of the limited liability company (or, if there is none, the Secretary of State) as such person's agent upon whom service of process may be made as provided in this section.

6 *Del. C.* § 18-109(a) (formatting added).

Like other entity statutes that authorize service of process on members of the governing body of an entity or its officers, Section 18-109(a) only provides a basis for specific jurisdiction, not general jurisdiction. *See Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 885 n.39 (Del. Ch. 2009). The claim against the manager must therefore "involv[e] or relat[e] to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of

13

the limited liability company." 6 *Del. C.* § 18-109(a). Puathasnanon does not contest that dimension of the analysis. She has argued separately that the plaintiff has failed to state any actionable claim against her, but she does not dispute that the claims involve or relate to the business of the Company or assert violations of duties that she allegedly owed to the Company or to members of the Company.

Section 18-109(a) defines the term "manager" to encompass both formal managers and acting managers. It states:

> As used in this subsection (a) and in subsections (b), (c) and (d) of this section, the term "manager" refers
>
> (i) to a person who is a manager as defined in § 18-101(10) of this title and
>
> (ii) to a person, whether or not a member of a limited liability company, who, although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company;
>
> provided however, that the power to elect or otherwise select or to participate in the election or selection of a person to be a manager as defined in § 18-101(10) of this title shall not, by itself, constitute participation in the management of the limited liability company.

6 *Del. C.* § 18-109(a) (formatting added); *accord id.* § 18-110(c) (using same definition). The two-part manager definition in Section 18-109(a) references Section 18-101(10), which defines a "manager" as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed." *Id.* § 18-101(10).

The first category of persons identified in Section 18-109(a)—formal managers—encompasses persons who have been officially named as managers in or designated

14

pursuant to the entity's governing documents. The second category of persons—acting managers—encompasses other persons, not formally named as managers, who nevertheless "participate[] materially in the management of the limited liability company." 6 *Del. C.* § 18-109(a)(ii).

Hudson contends that Puathasnanon was an acting manager under Section 18-109(a)(ii). Hudson does not claim that Puathasnanon was a formal manager under Section 18-109(a)(i).

### 1.      Playing A Significant Role In Management

To reiterate, Section 18-109(a)(ii) permits a plaintiff to serve process on a person who "participates materially in the management of the limited liability company." Based on dictionary definitions, "[t]he plain meaning of the word 'participate' involves taking part in or playing a role in an activity or event." *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *8 (Del. Ch. July 19, 2019) (citing definitions). "When modifying the word 'participate,' the word 'materially' introduces a level of significance. It requires meaningful participation, rather than minor participation." *Id.* (same). The plain language of Section 18-109(a)(ii) thus confers the status of an acting manager on an individual who has a significant role in managing an LLC or who plays a significant part in an activity or event that constitutes part of the management of the LLC.

This court has applied the plain language of the material-participation test in three cases, holding on each occasion that an officer of an LLC who held the title of president and performed functions customarily associated with that role satisfied the requirements for acting manager status. *See id.* at *11; *Phillips v. Hove*, 2011 WL 4404034, at *22

15

(Del. Ch. Sept. 22, 2011); *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at \*5 & n.25 (Del. Ch. Feb. 26, 2010). These precedents support the general principle that at the pleading stage, a showing that a defendant occupied a senior role in an LLC and performed functions consistent with that role is sufficient to qualify the defendant as an acting manager for purposes of Section 18-109.

In this case, the same precedents support the exercise of jurisdiction over Puathasnanon. As chief legal officer and general counsel, she occupied a senior role at the Company. The pleading-stage record supports an inference that she performed functions consistent with that role and, as a result, played a significant part in the events giving rise to the case. Puathasnanon worked with the Company's outside counsel to guide the Company, its officers, and the Board through the process of negotiating, approving, and effectuating the Merger. As part of that process, she provided advice to the formal managers serving on the Board and to the Company's officers. Indeed, it is reasonable to infer that as chief legal officer, Puathasnanon played a major role in shaping and carrying out the Company's legal strategy with respect to the Merger. At the pleading stage, that is sufficient to support an inference that Puathasnanon qualifies as an acting manager for purposes of a Rule 12(b)(2) motion.

16

## 2.      Full-Time Work For The Company In A Managerial Role

Dictionary definitions serve as an important starting point when determining plain meaning.[3] In many cases, reliance on dictionary definitions will be sufficient. But dictionary definitions are not the only possible source of plain meaning. Words appear in sentences, and "the meaning of sentences depends critically on context." *U.S. v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (Posner, J.). The natural habitat of words is thus a larger text; words appear in phrases, in sentences, in paragraphs, and in entire provisions. Those provisions in turn appear within still-larger texts, such as a statute or contract. When interpreting those documents, a court cannot read words in isolation; the court must construe the document as a whole.[4] Although dictionary definitions contribute significantly to the analysis, the words they contain do not appear in their natural habitat.

---

[3] *See, e.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *USA Cable v. World Wrestling Fed'n Ent. Inc.*, 766 A.2d 462, 474 (Del. 2000) (explaining that a term generally should be "construed in accordance with its ordinary dictionary meaning.").

[4] The holistic interpretation principle applies to contracts. *See E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."); *accord GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012). It likewise applies to statutes. *See Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) ("The General Assembly passed the pertinent statutes as a whole and not in parts or sections. Consequently, each part or section should be read in light of every other part or section to produce an harmonious whole.").

Indeed, in a symposium on statutory interpretation, one distinguished jurist referred to dictionaries as "word museums,"[5] and another commentator called them "word zoos."[6]

In addition to relying on dictionary definitions, a court may look to how a term or phrase is used in a particular legal context.[7] Put another way, "[u]nless a different intention is manifested" in the contract, "where language has a generally prevailing meaning, it is interpreted in accordance with that meaning," and "technical terms and words of art are given their technical meaning when used in a transaction within their technical field." Restatement (Second) of Contracts § 202(3) (Am. L. Inst. 1981).

The concept of "material participation" is one such term. The LLC Act did not invent it. Rather, the concept of material participation has a rich pedigree under federal

---

[5] Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994).

[6] A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 74 (1994).

[7] *See Hazout*, 134 A.3d at 290 & n.58 (collecting authorities demonstrating that where legislature uses term with "well-settled legal meaning," it uses it in its "legal sense"); *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (looking to "both legal and non-legal definitions" of "to make" when interpreting statute of limitations); *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 2018 WL 3343495, at *12 (Del. Ch. July 9, 2018) ("When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."); *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) ("[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."). *Cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 2005 WL 5775806, at *11 (Del. Ch. Aug. 22, 2005) (presuming use of words with "no accepted blackletter legal definition . . . was an implicit agreement by the parties to avoid the use of legal terms of art").

tax law, where it determines whether a taxpayer is an active participant in a trade or business, rather than a passive investor, and hence the extent to which the taxpayer can claim deductions for certain business losses.[8] The concept also plays a role in determining whether the interest that a taxpayer owns in an entity taxable as a partnership either (i) has the characteristics of a general partner interest and hence obligates the taxpayer to pay self-employment tax on the taxpayer's share of business income or (ii) has the characteristics of a limited partner interest and hence does not obligate the taxpayer to pay self-employment tax.[9]

Both issues are particularly pertinent to LLCs, which emerged as the brainchild of a group of sophisticated entity lawyers and tax practitioners who sought the entity-law Holy Grail of limited liability and partnership tax treatment. In 1977, they convinced the State of Wyoming to adopt the first LLC statute. In 1988, the Internal Revenue Service (the "IRS") ruled that this entity amalgam could indeed deliver both features. The IRS ruling accelerated the LLC's popularity,  and over the ensuing years, a number of

---

[8] *Harron*, 2019 WL 3282613, at *9; *see, e.g.*, I.R.C. § 469; *Mattie K. Carter Tr. v. United States*, 256 F. Supp. 2d 536, 539–42 (N.D. Tex. 2003); *Aragona Tr. v. Comm'r*, 142 T.C. 165, 171 (2014).

[9] *Harron*, 2019 WL 3282613, at *9; *see, e.g.*, I.R.C. § 1402; *Riether v. United States*, 919 F. Supp. 2d 1140, 1158–60 (D.N.M. 2012); Karen C. Burke, *Exploiting the Medicare Tax Loophole*, 21 Fla. Tax Rev. 570, 590–606 (2018) (describing "functional approach" to determining whether member in manager-managed LLC who is not designated as formal manager nevertheless is sufficiently active participant in business to acquire attributes of general partner and be subject to self-employment tax).

jurisdictions enacted LLC statutes. Delaware was one of those jurisdictions, and in 1992, the LLC Act became law.[10]

Given this history, "it is logical that the LLC Act would use tax-related concepts like 'material participation' consistently with the tax code, or at least would avoid using them inconsistently with the tax code. *Harron*, 2019 WL 3282613, at *10. Authorities governing the material-participation test for purposes of the tax code therefore can provide guidance as to how Section 18-109(a)(ii) uses the term. *Id.*

The tests that federal tax law enlists to determine the extent of the taxpayer's involvement in the LLC turn on facts and circumstances. The general rule is that a taxpayer "participates materially in a business if he or she works on a regular, continuous, and substantial basis in operations." I.R.C. § 469(h)(1). Under regulations enacted by the IRS, a taxpayer satisfies the requirements for material participation if she meets any one of seven tests, including (i) working more than 500 hours during a year in an activity, (ii) performing substantially all the work for an activity, or (iii) working more than 100 hours during a year in an activity where no one else works more than the taxpayer. Temp.

---

[10] *See* Symonds & O'Toole, *supra*, § 1.01[A] & [B]; Susan Pace Hamill, *The Story of LLCs: Combining the Best Features of a Flawed Business Tax Structure*, in *Business Tax Stories*, 295 (Steven A. Bank & Kirk J. Stark eds., 2005). Ever since, tax planning has been a major driver of governance decisions involving LLCs. *See generally* John M. Cunningham & Vernon R. Proctor, *Drafting Delaware Limited Liability Company Agreements: Forms and Practice Manual* § 1.03[B] (2011) (titling section: "The Importance of Tax Knowledge in Handling Delaware LLC Formations"); *id.* § 15.02 (titling section: "The Importance of Tax Knowledge for Lawyers Engaged in LLC Formation Practice"); *id.* chs. 15–22 (eight chapters addressing implications of federal and state tax issues for LLC formation).

Treas. Reg. § 1.469-5T(a) (2022). Although the IRS has not promulgated regulations governing when a non-managing member would be deemed to have the attributes of a general partner for purposes of self-employment tax, it has applied similar factors, including a test based on participating in an entity's trade or business for more than 500 hours per year. *See* Burke, *supra*, at 594; Cunningham & Proctor, *supra*, § 18.03[D].

These standards reinforce the pleading-stage inference that Puathasnanon participated materially in the business of the Company and hence qualifies as an acting manager for purposes of Section 18-109 of the LLC Act. It is reasonable to infer that serving as the Company's chief legal officer and general counsel was a full-time job and that the holder of those positions worked on a regular, continuous, and substantial basis to fulfill the associated obligations, thereby satisfying the criteria for the general rule for material participation. By the same token, it is reasonable to infer that serving as the Company's chief legal officer and general counsel required the holder of those positions to work more than 500 hours in a year in the activities that those positions entail. The allegations of the complaint depict Puathasnanon as a full-time general counsel with primary responsibility for the legal function at the Company. In connection with the Merger, the complaint describes how Puathasnanon provided advice to the Company's officers and the Board, interacted with the Company's outside counsel, attended meetings, prepared communications, and commented on materials.

By using the tax law tests for material participation to inform the analysis of Section 18-109, this decision is not equating the two. The Delaware statute plainly focuses on material participation *in the management* of the LLC. It would not be

sufficient to support service under Section 18-109 for an individual merely to be employed in a full-time capacity by the LLC or to participate in the LLC's trade or business for more than 500 hours per year. But if an individual inferably participated *in a senior management position* for more than 500 hours per year, that fact suggests a degree of participation in management that is sufficiently significant to qualify as material. Once again, the pleading-stage record amply supports an inference that Puathasnanon qualifies as an acting manager for purposes of a Rule 12(b)(2) motion.

### 3.    The Corporate Officer Consent Statute

A final source of interpretive guidance regarding the extent to which Section 18-109 extends to senior officers of an LLC is the analogous jurisdictional statute for corporations. That statute originally applied only to directors, and Delaware courts lacked the ability to exercise personal jurisdiction over senior officers. *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 778 (Del. Ch. 2009). To fix that flaw, the General Assembly amended the statute to encompass senior officers. *See* 10 *Del. C.* § 3114(b).

Section 3114(b) extends to any person who "[i]s or was the president, chief executive officer, chief operating officer, chief financial officer, chief legal officer, controller, treasurer or chief accounting officer of the corporation at any time during the course of conduct alleged in the action or proceeding . . . ." 10 *Del. C.* § 3114(b). Section 3114(b) thus expressly encompasses a chief legal officer.

The fact that Section 3114(b) extends to C-suite officers, including the chief legal officer, indicates that those officers participate materially in the management of the corporation in a manner sufficient to support jurisdiction in Delaware by implied consent.

By the same logic, individuals who hold comparable roles in an LLC participate materially in the management of the LLC in a manner sufficient to support jurisdiction in Delaware by implied consent. Under this reasoning, Section 18-109 extends to a general counsel and chief legal officer like Puathasnanon.

Puathasnanon draws a different inference from the contrast in language between Section 3114 and Section 18-109. She stresses that although Section 3114 expressly mentions the chief legal officer, Section 18-109 does not. She infers that the General Assembly must have intentionally omitted chief legal officers, because the General Assembly plainly knew how to name them specifically. She concludes that because the General Assembly did not do so in Section 18-109, the court should hold that a chief legal officer cannot qualify as an acting manager for purposes of service of process.

That argument is not convincing. For starters, it proves too much. Section 3114 mentions not only the chief legal officer, but also other C-suite officers, including the president. Under Puathasnanon's interpretation, Section 18-109 could not reach any officers, because it does not list any specific titles. The upshot of such a rule would be that the Delaware courts could not exercise jurisdiction over key actors in a Delaware entity. Moreover, this court has held previously that Section 18-109 extends to an individual who holds the title of president and fulfills those functions. *See Harron*, 2019 WL 3282613; *Hove*, 2011 WL 4404034; *PT China*, 2010 WL 761145. Puathasnanon's reading conflicts with those precedents, because Section 18-109 does not mention the title of "president" either.

23

There is a different and obvious reason why the drafters of the LLC Act did not attempt to include a list of officer positions in Section 18-109. An LLC is a flexible and primarily contractual entity. The statutory scheme contemplates members and managers, and it provides for member-managed LLCs and manager-managed LLCs. Within the parameters of the statute, however, drafters have great freedom to create a bespoke entity that suits their needs. *See Llamas v. Titus*, 2019 WL 2505374, at *17–18 (Del. Ch. June 18, 2019); *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016). The LLC Act does not contemplate a customary set of officer provisions, nor is there a historical set of officer positions that an LLC might be expected to have.

A flexible entity requires a flexible jurisdictional statute. Because of the flexibility of LLCs, Section 18-109 understandably eschews specific officer titles as a means of securing jurisdiction over senior officers. Instead, Section 18-109(a)(ii) empowers Delaware courts to exercise personal jurisdiction over individuals who participate materially in the business of an LLC, regardless of title or membership status, for claims relating to their actions. The LLC Act's language is encompassing, not exclusionary.

In this case, the governance structure of the Company bolsters the analogy to Section 3114 and the use of Section 18-109 to encompass Puathasnanon. Article V of the LLC Agreement creates a manager-managed structure that approximates many features of a corporation. Section 5.1 vests sole authority in the Board to direct and oversee the business and affairs of the Company. Ex. 1 § 5.1. Section 5.4 empowers the Board to delegate authority to officers, and it expressly aligns P3 officer responsibilities with those of a corporate officer. *See* Ex. 1 § 5.4. In particular, Section 5.4 lists as examples of

24

officer positions several of the corporate officer titles that appear in Section 3114, such as "chief executive officer, chief operating officer, [and] chief financial officer." *Id.* In her capacity as chief legal officer and general counsel, Puathasnanon has titles and serves in roles that correspond to an officer position that Section 3114 encompasses and which supports personal jurisdiction in Delaware.

It is particularly easy to apply Section 18-109 to Puathasnanon because of the provisions in the LLC Agreement that create a corporate-like governance structure and draw explicit parallels between the Company's senior officers and their corporate counterparts in this case. But those provisions are not essential to the result. This decision would reach the same pleading-stage holding without those provisions. As the chief legal officer of the Company, Puathasnanon is subject to personal jurisdiction in Delaware by analogy to Section 3114.

### 4. Puathasnanon's Counter Arguments

To argue against service of process under Section 18-109(a)(ii), Puathasnanon relies most heavily on two recent Delaware cases: *Dlayal Holdings, Inc. v. Al-Bawardi*, 2021 WL 6121724 (Del. Ch. Dec. 27, 2021) and *CelestialRX Investments, LLC v. Krivulka*, 2019 WL 1396764 (Del. Ch. Mar. 27, 2019). These cases are not persuasive precedents for Puathasnanon's motion to dismiss.

The *Dlayal Holdings* case involved an LLC (Oasis) that was a wholly owned subsidiary of a real estate holding and management company. *Dlayal Hldgs.*, 2021 WL 6121724, at *2. The third-party defendant (Gracey) did not serve as a formal manager of either Oasis or its parent company. *Id.* Instead, he was the day-to-day manager of two

25

ranches that Oasis owned. Gracey's duties included entering into contracts necessary for managing the ranches, but he was not authorized to sell or permanently encumber the ranches. *Id.* Oasis held other assets, so it was not possible to infer at the pleading stage that managing the assets of the entity was the functional equivalent of managing the entity itself. *See id.* at *8. The court declined to infer that Gracey was an acting manager of Oasis who was subject to personal jurisdiction in Delaware. *Id.* at *6.

This case is different. Puathasnanon was a senior officer of the Company, not a subsidiary. She held presumptively senior roles within the entity. The operative complaint alleges that she acted consistently with those roles in connection with the Merger. She advised the Company's officers and the Board regarding the Merger, she worked with outside counsel, and she oversaw the legal issues raised by the transaction. *See* AC ¶¶ 44, 56. If Puathasnanon had been a more junior lawyer within the organization, perhaps advising a business unit or overseeing a single legal function, then the analogy to *Dlayal Holdings* could be more persuasive. Instead, Puathasnanon was the *chief* legal officer and general counsel.

In *CelestialRX*, a formal manager dominated the LLC to the extent that he was described as the "emperor, supreme leader, and dictator for life" with "absolute control and discretion without expressed limits." 2019 WL 1396764, at *19. So great was the formal manager's domination of the entity that the title of "employee" more accurately described the role of the president and CEO. *Id.* at *22. When a plaintiff sought to sue the president and CEO in Delaware, this court declined to exercise personal jurisdiction, holding that the formal manager controlled the entity. *See id.*

26

The *Harron* decision analyzed the *CelestialRX* decision extensively as part of a line of decisions that have applied what the *Harron* case labeled the "control overlay test." *See* 2019 WL 3282613, at *17–20.[11] The *Harron* decision examined the control overlay test and explained why it conflicts with the plain language of Section 18-109. That analysis remains applicable here and defeats Puathasnanon's reliance on *CelestialRX*. She has not meaningfully distinguished the analysis in *Harron*, which this decision will not repeat.

Puathasnanon's arguments are not sufficient to support a pleading-stage dismissal. Hudson is entitled to an inference that Puathasnanon participated materially in the management of the Company and is subject to service of process under Section 18-109.

## B. Due Process

Once a plaintiff has identified a valid method of serving process, the court must assess "whether [the defendant] engaged in sufficient minimum contacts with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice." *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (internal quotation marks omitted). In addition to the defendant's contacts with the state, relevant factors include "the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective

---

[11] In addition to *CelestialRX*, the cases in this line of authority include: *Wakley Ltd. v. Ensotran, LLC*, 2014 WL1116968 (D. Del. Mar. 18, 2014); *In re Arctic Ease, LLC*, 2016 WL 7174668 (Del. Ch. Dec. 9, 2016); *Florida R & D Fund Invs., LLC v. Florida BOCA/Deerfield R & D Invs., LLC*, 2013 WL 4734834 (Del. Ch. Aug. 30, 2013).

relief . . . ; [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies . . . ." *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 220 (Del. 1982) (citations omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Asserting jurisdiction over a senior corporate officer based on an implied consent statute "readily satisfies due process" for purposes of claims that relate to the defendant's role as an officer. *Ryan*, 935 A.2d at 273. The court in *Ryan* asserted jurisdiction over the chief financial officer of a corporation (Jasper) under Section 3114(b). *Id.* In making short work of the due process issue, the court emphasized Jasper's role as a corporate officer, explaining: "It almost goes without any further elaboration that, as chief financial officer of a Delaware corporation, Jasper availed himself of Delaware law such that he should reasonably anticipate being haled into Delaware's courts." *Id.*

The same analysis applies under Section 18-109. Due process is satisfied on the basis of implied consent as long as (i) the allegations against the defendant-manager focus centrally on the defendant's rights, duties and obligations as a manager of a Delaware LLC; (ii) the resolution of the matter will be inextricably bound up in Delaware law; and (iii) "Delaware has a strong interest in providing a forum for the resolution of the dispute relating to the manager's ability to discharge his managerial functions." *Assist Stock Mgmt. L.L.C., v. Rosheim*, 753 A.2d 974, 982 (Del. Ch. 2000). A person who takes on a managerial role has "impliedly consented to being sued in a Delaware court to adjudicate disputes so inherently intertwined with that fiduciary position." *Id.*; *accord Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *7 (Del. Ch. Mar. 20, 2012) ("Section

18-109 extends, consistent with due process, to encompass an alleged violation by a manager of . . . duties owed by the manager under the operative limited liability company agreement."). Section 18-109 extends further to encompass matters "involving or relating to the business" of the LLC, and it is possible that a minimum contacts analysis might be required to avoid an unconstitutional application of that broadly worded language. *Id.* at 980; *accord Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *9 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012). But when the action relates to a violation by the manager of a fiduciary duty owed to the LLC and its members, then the exercise of jurisdiction under Section 18-109 complies with due process. *PT China,* 2010 WL 761145, at *5; *see id.* at 8 n.44 ("By accepting a key management position over two Delaware limited liability companies, [the defendant] submitted himself to the jurisdiction of the Delaware courts in suits pertaining to his rights, duties, and obligations as a manager.").

This is an easy case for the minimum contacts analysis. Puathasnanon served as the general counsel and chief legal officer of a Delaware entity. In doing so, she both held and exercised "the authority and duties that are normally associated with that office." Ex. 1 § 5.4. When she took on those roles and assumed the associated powers and duties, she consented implicitly to jurisdiction in this court for claims involving her actions. She doubtless anticipated—and in any event should have anticipated—that she could face litigation in Delaware over her actions as a senior officer of a Delaware entity. The claims against her in this case assert that she breached her fiduciary duties when acting in those roles. The constitutional requirements of due process are satisfied, and this court

can exercise personal jurisdiction over Puathasnanon for purposes of Counts IX and X.

## III.    CONCLUSION

Puathasnanon is subject to personal jurisdiction in Delaware for purposes of the claims asserted in this case. Her motion to dismiss this action pursuant to Rule 12(b)(2) is denied.